Mack SANDERS, et al.

v.

**FIRST NATIONAL BANK IN GREAT BEND, et al.**

No. 3:88–0528.

United States District Court, M.D. Tennessee, Nashville Division.

May 22, 1990.

William P. Sutherland, Watkins, McGugin, McNeilly & Rowan, Nashville, Tenn., for plaintiffs.

William R. O'Bryan, Jr., Anita L. Whisnant, Trabue, Sturdivant & DeWitt, Nashville, Tenn., for defendants.

## MEMORANDUM

WISEMAN, Chief Judge.

In this "lender liability" suit, the plaintiffs allege that the defendants, First National Bank in Great Bend (First National or Bank) and Thomas Burcham, the bank's Chief Operating Officer, wrongfully instituted collection actions, forcing plaintiffs into bankruptcy. Plaintiff Mack Sanders is a businessman who at all times material to the suit either owned or controlled five communications corporations. The corporations, JACO, Inc., MetroGeneral Communications, Inc., MetroGeneral Communications of Nashville, Inc., MetroGeneral Communications of Knoxville, Inc., and MetroGeneral Communications of Alabama, Inc., owned and managed several radio stations. Sanders owned 100% of JACO. JACO owned all the stock of MetroGeneral, which in turned owned all the stock of its three subsidiaries. Sanders, his wife, Sherry, and all the corporations have now filed

bankruptcy. Jane Forbes is the trustee for each of the estates.

Mr. and Mrs. Sanders and JACO had a longstanding relationship with First National. In 1986, the bank made eight loans to Mack Sanders, Sherry Sanders and/or JACO, totalling $1,991,191.06.[1] Exhibits in Support of Defendants' Motion and Brief for Summary Judgment (Defendants' Exhibit), Exhibit 2. Mack Sanders personally guaranteed all obligations of Sherry Sanders and JACO under the notes. *Id.* Sherry Sanders personally guaranteed all obligations of Mack Sanders under the notes. *Id.* Consequently, Sherry Sanders was personally liable for all the notes except two executed by Mack Sanders as President of JACO in favor of the bank. By the end of 1986, all of the loans were in default.

The plaintiffs' difficulties in repaying the notes stemmed from Mack Sanders' failure to sell his radio stations. In March, 1985, he sold six stations to Elf Communications, Inc., for a stated consideration of twelve million dollars. As part of the deal, Elf executed two three-million-dollar notes, payable to MetroGeneral and its subsidiaries, but subordinated to two other lienholders, making MetroGeneral a third lienholder on the stations. To help facilitate the deal, Mr. Sanders obtained two $750,000 letters of credit in favor of the senior lienholders and secured a portion of Elf's debt to the seniors. First National issued one of the letters of credit. Elf made only one payment on the notes. According to the bank, by the time Elf stopped paying, Sanders had loans from the bank that were long overdue and in default.

In discussions in early 1986, Sanders assured the bank that proceeds from the resale of the stations would be used to pay off the loans. In March 1986, the stations were sold to Rebs, Inc., and Rebs' three subsidiaries. Rebs assumed liability on the two three-million-dollar notes, and made several payments before stopping in June 1986.

In October 1986, First National was called upon to honor the $750,000.00 letter of credit that it had issued as part of the Elf deal, prompting the bank to request additional collateral from Mr. Sanders. Sanders provided a deed of trust on certain realty owned by the Sanders. Meantime, Sanders failed to find another buyer for the radio stations.

In January 1987, representatives of the bank came to Nashville to discuss with Sanders the defaulted loans. As a result of the discussions, the parties executed a Security Agreement on January 28, 1987. Mack Sanders signed the agreement personally and on behalf of each of the five corporations under his control. Sherry Sanders, though a named party to the agreement, did not sign the agreement. *See* Defendants' Exhibit 8. In the agreement, the bank stated that it

> [I]s accepting the additional collateral provided for in this Security Agreement in lieu of taking any immediate action to collect the indebtedness presently owed to it by the Debtors but is not agreeing to refrain, for any specific length of time, from taking such action to collect the indebtedness owed to it by the debtors[.]

The bank advanced no new funds in connection with the agreement. Under the agreement, MetroGeneral and its subsidiaries, referred to as "Pledgors," granted the bank a security interest in the three-million-dollar promissory notes executed by Elf and then by Rebs. The agreement provided that the pledgors shall be in default if, *inter alia,* any of the parties to the agreement commenced any proceeding in bankruptcy, and that upon default the bank may require the pledgors to make the collateral available to the bank. At the same time he executed the Security Agreement, Mr. Sanders executed a document assigning the MetroGeneral corporations' interests in the promissory notes to the bank. *Id.*

Mr. Sanders has testified in deposition that he expected the bank to wait "until

---

**1.** From the record, it appears that the 1986 promissory notes do not reflect "new loans," but rather they were new notes that effectively renewed previous loans.

hell freezes over" before taking any action to collect on the debt and that he expected the bank to help collect the money owed him. Sanders also stated that he read and understood the agreement, but that he signed it without consulting an attorney. Sanders has also testified that the bank made no effort to coerce him into signing the agreement, except that it made the trip to Nashville to discuss it, indicating the importance of the matter to the bank, and that the bank made no threats against him. Sanders Deposition at 160.

Approximately one month after the Security Agreement was executed, Rebs filed a voluntary Chapter 11 petition in bankruptcy. A few days later, on March 3, 1987, Sanders, JACO and MetroGeneral also filed voluntary Chapter 11 petitions.[2]

The plaintiffs have alleged that formal collection efforts by the bank rendered plaintiffs insolvent and forced them into bankruptcy. But the bank instituted no formal collection efforts before March 3. Mr. Sanders claims that he heard rumors that the bank intended to begin legal proceedings to collect the debt. On March 1, Sanders spoke with Gregory Fankhauser, a representative of the bank. Sanders testified in deposition that he got the clear impression from the conversation that the bank would be taking action against him, but he does not recall that Fankhauser ever told him that the bank was going to take legal action. Sanders Deposition at 78–79. Mr. Sanders has also admitted that pressure from the IRS played a role in precipitating the bankruptcy filing. Rule 2004 Examination of Mack Sanders, Defendants' Exhibit 3 at 32–34. Mr. Sanders has testified that he did not have an attorney at the time of his conversation with Mr. Fankhauser, but that he had previously met with attorneys to discuss options because of Rebs' financial difficulties and the pressure from the IRS.

On March 11, 1987, the bank filed suit against Sherry Sanders in the United States District Court for the Middle District of Tennessee, Case No. 3–87–0195

(Nixon, J.), on the eight notes executed in 1986 and on the written guaranties of her husband's indebtedness. She defended on the grounds that a pre-nuptial agreement and the capacity in which she signed the notes precluded her liability. The Court found her liable on six of the eight notes and entered judgment against her for $758,744.91 on April 13, 1988. Ms. Sanders did not raise any counterclaims in the suit. On April 28, she filed a voluntary Chapter 7 petition for bankruptcy.

On September 23, 1987, the bank sued Mack Sanders in bankruptcy, requesting a nondischargeable judgment on the 1986 notes on the grounds that he misrepresented his financial condition in 1986 by eleven million dollars. In the adversary proceedings, Sanders raised no counterclaims, stipulating the amount of liability but arguing that he did not misrepresent his financial condition. Judge Lundin entered a nondischargeable judgment for $1,583,361.25 against Sanders on July 28, 1988. The judgment was affirmed on appeal. Defendants' Exhibits 12–15. On May 2, 1989, in an adversary proceeding against Mrs. Sanders, the bank obtained a default judgment that the judgment entered in Judge Nixon's court was non-dischargeable. Defendants' Exhibit 16.

On June 27, 1988, approximately one month before the judgment against Mr. Sanders in bankruptcy, plaintiffs filed this action. In their complaint, plaintiffs aver that in instituting collection actions, the defendants breached an oral agreement with the plaintiffs to decline to take collection action, and breached various written and implied provisions of the Security Agreement. Plaintiffs aver that the bank violated the anti-tying provision of the Bank Holding Company Act. 12 U.S.C. § 1972. Plaintiffs also aver that the bank was guilty of "tortious fraud and duress in instituting formal collection procedures, in that the bank and/or Burcham knew, at the time the contract was entered into, that the Bank had no intention of honoring its obligation." Complaint at ¶ 20. Plaintiffs also aver that defendants wrongfully interfered

---

**2.** These cases were converted to Chapter 7 on 8/18/87. MetroGeneral's three subsidiaries filed Chapter 7 petitions on 12/10/87. Those three cases have been consolidated into Metro-General's case.

with the corporate plaintiffs' corporate governance rights and that Burcham wrongfully interfered with contractual relations and induced the bank to breach its agreement with defendants. Plaintiffs also assert an equitable subordination or equitable subrogation theory of recovery. All of plaintiffs' claims are now before the Court on defendants' motion for summary judgment.

### ANALYSIS

Defendants have requested summary judgment as to all of plaintiffs' claims. Plaintiffs have conceded three matters. First, plaintiffs concede, as they must, that all of their allegations against Mr. Burcham refer to actions that he allegedly took on behalf of the corporate entity of which he was an officer and that he cannot be liable for wrongfully inducing the bank to breach its contract with plaintiffs. *Cf., e.g., Edwards v. Travelers Ins. of Hartford, CT*, 563 F.2d 105, 121 (6th Cir.1977). Second, plaintiffs concede correctly that their allegations do not support a claim for equitable subordination and/or equitable subrogation. *Cf., e.g., In re B & L Laboratories, Inc.*, 62 B.R. 494 (Bankr.M.D.Tenn. 1986); *In re Glade Springs, Inc.*, 47 B.R. 780 (Bankr.E.D.Tenn.1985). Third, plaintiffs have conceded that only the bankruptcy trustee is "the real party in interest" and properly a plaintiff in this law suit. Indeed, only the trustee has standing to pursue claims on behalf of the debtor-plaintiffs' estates. *See, e.g., Bauer v. Commerce Union*, 859 F.2d 438, 441 (6th Cir. 1988). Therefore, the Court grants the motion for summary judgment as to the equitable subordination/subrogation claim and to the claims against defendant Burcham. Furthermore, the plaintiffs other than the trustee are dismissed with prejudice.

### I. THE CLAIMS ON BEHALF OF MACK SANDERS AND SHERRY SANDERS MUST BE DISMISSED FOR FAILURE TO RAISE THEM AS COMPULSORY COUNTERCLAIMS IN PRIOR LITIGATION.

■ Rule 13(a), Fed.R.Civ.P., requires a litigant to state as a counterclaim "any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." A counterclaim that is compulsory but not pleaded in accordance with the rule, is thereafter barred. *E.g., id.*, Notes of Advisory Committee on Rules, Note 7; *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n. 2, 94 S.Ct. 2504, 2506 n. 2, 41 L.Ed.2d 243 (1974). Bankruptcy Rule 7013 provides that Rule 13(a), Fed.R.Civ.P., shall also apply to adversary proceedings in bankruptcy, but provides a more liberal escape from the effect of failing to plead a compulsory counterclaim. Under the Bankruptcy Rule, "a trustee or debtor in possession who fails to plead a counterclaim through oversight, inadvertence, or excusable neglect, or when justice so requires, may by leave of court amend the pleading, or commence a new adversary proceeding or separate action."

■ To fall under either rule, the counterclaim must arise out of the transaction or occurrence that is the subject matter of the opposing party's claim. The prevailing test, and that adopted in this circuit, for determining whether a claim arises out of the same transaction or occurrence is the "logical relationship" test. *E.g., Maddox v. Kentucky Finance Co., Inc.*, 736 F.2d 380, 382 (6th Cir.1984). Originally formulated in *Moore v. New York Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926), the test defines "transaction" flexibly to "comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Id.* at 610, 46 S.Ct. at 371. What constitutes a "logical relationship" for the purposes of the rule has not been defined precisely. The Third Circuit has provided the classic definition:

The phrase "logical relationship" is given meaning by the purpose of the rule

which it was designed to implement. Thus, a counterclaim is logically related to the opposing party's claim when separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts. Where multiple claims involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties, fairness and considerations of convenience and of economy require that the counterclaimant be permitted to maintain his cause of action.

*Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 634 (3rd Cir.1961).

■ Defendants argue that the claims on behalf of Mack and Sherry Sanders are barred because they failed to raise the claims in prior litigation. Defendant bank sued Sherry Sanders in the United States District Court for the Middle District of Tennessee on the promissory notes that she executed in 1986 and on her guaranties of her husband's indebtedness. The complaint was filed on March 11, 1987, and judgment entered in favor of the bank on April 8, 1988. At no time during the proceedings did Mrs. Sanders raise any of the claims asserted in the instant suit. According to plaintiff, the suit now before the court arises out of events and circumstances occurring "well after" execution of the notes that were the subject of the prior litigation. Plaintiff argues that this law suit arises out of the Security Agreement, not out of the promissory notes or guaranties. Further, plaintiff argues that Mrs. Sanders was not a party to the Security Agreement. Consequently, plaintiff contends that Mrs. Sanders was not obligated under Rule 13(a) to raise the claims in the previous litigation. The Court does not agree.

■ In general, garden variety lender liability claims alleging wrongful lending or collections practices arise out of the same transaction as the lenders' causes of actions to collect on the loans. *See Continental Illinois Nat'l Bank & Trust Co. v. Windham*, 668 F.Supp. 578, 583–84 (E.D.

Tex.1987), *motion to reconsider denied*, 685 F.Supp. 152 (1988). *Cf. Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 420 (3d Cir.1988) (action for breach of loan agreements and fraudulent misrepresentations that allegedly forced debtor into bankruptcy arose out of parties' lending agreements and course of dealing for purpose of equitable and judicial estoppel analyses); *Bank of Montreal v. Kough*, 430 F.Supp. 1243 (N.D.Cal.1977) (allegations of fraud and misrepresentation and interference with business interest are compulsory counterclaims to suit on guaranty agreement). Plaintiff's contention that this suit arises out of the Security Agreement rather than the promissory notes does not remove this case from the scope of the general rule.

The Security Agreement is meaningful only in relation to the promissory notes and guaranties that the bank sought to collect in its action against Mrs. Sanders. The Security Agreement refers to the notes and guaranties and, whether it is binding as written or as construed by plaintiffs, manifests negotiations concerning the rights and liabilities arising out of the notes and guaranties. As construed by plaintiffs, the negotiations resulted in the bank's agreement either to waive or to refrain from exercising its rights under the terms of the 1986 promissory notes and related personal guaranties. Mrs. Sanders could have argued in her prior litigation with the bank that the Security Agreement precluded the bank from proceeding against her. Although she was not a signatory to the Security Agreement, she was a direct beneficiary, entitled to assert the same rights under the contract as the signatories. *See, e.g., Stewart v. Sullivan County*, 196 Tenn. 49, 264 S.W.2d 217, 219 (1953), *pet. to rehear denied* (1954). Her failure in the prior litigation to assert her rights under the Security Agreement, if any, has resulted in piece meal litigation of her dispute with the bank and in the duplication of judicial resources that Rule 13(a) is designed to avoid.

In short, the Security Agreement is "logically related" to the notes. An action con-

cerning the Security Agreement and surrounding negotiations arises out of the same transaction or occurrence as does an action on the notes and related guaranties upon which the bank sued Mrs. Sanders. Thus, the allegations now raised by plaintiff were compulsory counterclaims to the bank's action against Mrs. Sanders. Because Mrs. Sanders failed to assert the claims in the prior litigation, they cannot be asserted on her behalf in this litigation.

The same analysis concerning the logical relationship between the Security Agreement and the 1986 notes and related guaranties also applies to the claims on behalf of Mr. Sanders. Adversary proceedings in bankruptcy are " 'full blown federal lawsuits within the larger bankruptcy case,' " *Section 1120(A)(1) Committee of Unsecured Creditors v. Interfirst Bank Dallas, N.A. (Matter of Wood & Locker, Inc.)*, 868 F.2d 139, 142 (5th Cir.1989) (quoting E. Warren & J.L. Westbrook, *The Law of Debtors and Creditors* 175 (1986)), and fall squarely within the compulsory counterclaim rule. *Cf. D–1 Enterprises, Inc. v. Commercial State Bank*, 864 F.2d 36, 38–40 (5th Cir.1989), *on petition for rehearing, withdrawing*, 852 F.2d 823 (counterclaims are compulsory only in adversary proceedings, not in contested matters). Plaintiff argues, however, that the limited scope of a proceeding to determine whether a debt is dischargeable under 11 U.S.C. § 523 precludes application of the compulsory counterclaim rule to Mr. Sanders' claims.

 It is true that a claim and counterclaim may arise out of the same transaction within the literal terms of Rule 13(a), yet not bear a logical relationship making the counterclaim compulsory. *Maddox v. Kentucky Finance Co., Inc.*, 736 F.2d 380, 383 (6th Cir.1984). For example, in *Maddox*, the court considered whether a common law debt action was a compulsory counterclaim to an action challenging the adequacy of disclosures under Consumer Credit Protection Act, otherwise known as the Federal Truth In Lending Act (TILA), 15 U.S.C. § 1601 *et seq.* Noting that the TILA claim *does not involve obligations created by the underlying contract* and enforces a federal policy by invoking a civil penalty, and that a contrary holding may frustrate the federal policies by compelling TILA claims to be raised in state court debt actions, the court followed the Fourth and Seventh Circuits and held that the debt counterclaim was not compulsory. *Id.* at 382–83 (agreeing with *Valencia v. Anderson Bros. Ford*, 617 F.2d 1278 (7th Cir.1980), *rev'd on other grounds*, 452 U.S. 205, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981) and *Whigham v. Beneficial Fin. Co. of Fayetteville*, 599 F.2d 1322 (4th Cir.1979); disagreeing with *Plant v. Blazer Fin. Svcs, Inc. of Georgia*, 598 F.2d 1357 (5th Cir.1979)).

The circumstances currently before the Court, however, are distinct from those presented in *Maddox*. The ultimate issue in an action under 11 U.S.C. § 523(a)(2)(A) or (B) is whether the debtor obtained credit through a material representation that the debtor knew was false or made with gross recklessness as to its truth. *Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 932 (6th Cir.1986). The logically prior issue, however, is whether the creditor has any right in the first place to collect on a particular debt. Absent a right to proceed on the debt, the question of discharge is moot. Unlike a TILA action, therefore, an action to determine dischargeability necessarily involves obligations created by the underlying loan agreement(s). Absent extenuating circumstances, the nature of the rights and obligations created by the underlying agreements is appropriately litigated in a single action. Furthermore, requiring the debtor, or the trustee on behalf of the debtor, to raise claims concerning the creditor's collection or lending practices is consistent with the competence of and policies underlying the bankruptcy system. Determining whether and to what extent a creditor may recover from an insolvent debtor and providing a mechanism to enable the debtor to pursue legitimate claims to enhance the estate are integral aspects of bankruptcy.

For these reasons, the Court holds that the claims presented in this action were compulsory counterclaims in the adversary

proceeding to determine the dischargeability of Mr. Sanders' obligations to the bank. Mr. Sanders' failure to assert the claims in the discharge proceeding precludes their litigation on his behalf in this court.[3]

## II. THE PLAINTIFF HAS FAILED TO PRESENT EVIDENCE SUFFICIENT TO ESTABLISH ELEMENTS ESSENTIAL TO PROVE ANY OF HER CLAIMS.

The Court holds that the claims on behalf of Mack and Sherry Sanders are barred by the compulsory counterclaim rule. Alternatively and additionally, the court holds that defendants are entitled to summary judgment on the merits of each of the claims asserted in this lawsuit.

 In determining the remaining grounds for defendants' motion, this court is guided by the principles set forth in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Under Rule 56, Fed.R.Civ.P., summary judgment is appropriate where, after adequate time for discovery, the non-moving party fails to make a showing sufficient to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. To withstand a motion for summary judgment, the non-moving party must go beyond the pleadings and come forward with "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. Where the non-movant presents evidence that is merely colorable, or not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Despite extensive

discovery in this matter, plaintiff has simply failed to come forward with probative evidence to support any of her claims.

### A. The Record Does Not Support a Claim that Defendant Violated 12 U.S.C. § 1972.

 Plaintiff alleges a violation of the anti-tying provision of the Bank Holding Company Act, 12 U.S.C. § 1972. To prevail, plaintiff must plead and prove three elements: the banking practice in question was unusual in the banking industry; there existed an anti-competitive tying arrangement; and the practice in question benefits the bank. *Rae v. Union Bank*, 725 F.2d 478, 480 (6th Cir.1984). Plaintiff alleges that the agreement under which the bank took new collateral in exchange for its agreement not to immediately foreclose violates the act. Nothing in the record suggests that taking additional collateral to secure the loans in light of plaintiff's financial condition is unusual in the banking industry. To the contrary, such efforts to protect the bank's position are well within the bounds of ordinary banking practice. *See, e.g., Nordic Bank PLC v. Trend Group, Ltd.*, 619 F.Supp. 542, 557 (S.D.N.Y.1985). Therefore, the Court grants summary judgment to defendant on plaintiff's anti-tying claim.

### B. Plaintiff Has Failed to Produce Evidence Sufficient To Support Claims of Fraud or Duress.

In a somewhat convoluted allegation, the "[p]laintiffs aver that the Bank was guilty of unlawful, wrongful, and tortious fraud and duress in instituting formal collection procedures, in that the Bank and/or Burcham knew, at the time the contract was entered into, that the Bank had no intention of honoring its obligations." Complaint ¶ 20. As written, it is not clear

---

**3.** The Court recognizes that the debtor or trustee may be granted leave to assert in subsequent litigation an unplead compulsory counterclaim, in the event of "oversight, inadvertence, or excusable neglect, or when justice so requires[.]" Neither Mr. Sanders nor the trustee, however, have made any showing to avail themselves of this provision of Rule 7013.

It may also be the case that the claims on behalf of the corporate plaintiffs are barred by the compulsory counterclaim rule because they are in privity with Mr. and Mrs. Sanders. But the defendant has not presented this argument to the Court. Moreover, as the discussion below will demonstrate, the Court needs not reach this issue because it finds no substantive merit in any of the claims presented.

whether plaintiff is alleging that the act of instituting collection procedures somehow constitutes fraud and/or duress, or that the institution of collection procedures is evidence of fraud in the inducement or duress in entering the Security Agreement. Only the latter scenario conceivably frames a claim for fraud or duress. On the record presented to the Court, however, the claim must fail as a matter of law.

■ Plaintiff's fraud claim is more precisely a claim for "promissory fraud." Typically, to sustain a claim of fraud under Tennessee law, the plaintiff must prove (1) a representation of an existing or past fact rather than an opinion concerning future events, (2) that is false and material, (3) made knowingly, recklessly, carelessly or without belief in its truth, (4) upon which the plaintiff reasonably relies, and (5) which proximately causes damage to the plaintiff. *See, e.g., Edwards v. Travelers Insur. of Hartford, Conn.,* 563 F.2d 105, 110–13 (6th Cir.1977); *Haynes v. Cumberland Builders, Inc.,* 546 S.W.2d 228, 232 (Tenn.App.1976), *cert. denied* (1977). The theory of "promissory fraud" modifies the first element of the traditional fraud claim. Under the "promissory fraud" theory, the plaintiff must establish that the defendant made a promise of future conduct with the present intention not to perform the promise. *Fowler v. Happy Goodman Family,* 575 S.W.2d 496, 499 (Tenn.1978). Although it has long been the majority rule, the Tennessee Supreme Court has only recently indicated that it would recognize the promissory fraud theory "in a proper case where justice so demands." *Id.* (citing *Bolan v. Caballero,* 220 Tenn. 318, 417 S.W.2d 538, 541 (1967)). *See also S & H Computer Sys., Inc. v. SAS Institute, Inc.,* 568 F.Supp. 416, 420 (M.D.Tenn.1983) (Wiseman, J.) (noting that the Tennessee Supreme Court would now recognize an action for promissory fraud); *Brungard v. Caprice Records, Inc.,* 608 S.W.2d 585, 590 (Tenn.App.1980) (Drowota, J.) (same); *Farmers & Merchants Bank v. Petty,* 664 S.W.2d 77, 82 (Tenn.App.1983) (Conner, J., concurring) (same).

■ The party alleging promissory fraud bears the burden of proving its allegation that the defendant made a promise without intending to perform. *Brungard,* 608 S.W.2d at 590. Although circumstantial evidence ordinarily is sufficient to prove fraud claims in Tennessee, *see Edwards,* 563 F.2d at 112, the Tennessee courts impose a greater burden upon plaintiffs alleging claims of promissory fraud. As Judge Conner explained in his concurrence in *Farmers & Merchants Bank,*

> I must agree with the majority's finding that the Supreme Court has indicated an unwillingness to apply the doctrine except in those cases where there is direct proof of a misrepresentation of actual *present* intention. There seems to be considerable reluctance on the part of the court to infer a false intent from the subsequent failure to follow through on a promise. *See Fowler,* [575 S.W.2d at 499.] In *Brungard* [where the found that plaintiff's recovery could be predicated on promissory fraud] there was overwhelming evidence that the defendant knew its statements regarding future intent were false at the time they were made. 608 S.W.2d at 588–90.

664 S.W.2d at 82.

Both *Fowler* and *Farmers & Merchants Bank* are instructive in determining whether the plaintiff in the case at bar has met her burden. In *Fowler,* the party alleging fraud submitted an affidavit attesting that he believed that alleged future promises were false and calculated to mislead him, supported only by allegations that the opposing party then failed to perform the alleged promises. The court held that this evidence was legally insufficient to establish that the promises were made without any intention that they would be performed. 575 S.W.2d at 499. In *Farmers & Merchants Bank,* the defendant to an action to collect on a note pleaded fraud and counterclaimed for damages, alleging that he had been induced into signing the note by the bank's statements that he would never have to pay the note. Although the jury returned a verdict in favor of the counterplaintiff, the Court of Appeals reversed, holding, *inter alia,* that as

a matter of law the alleged promisor's failure to keep the promise did not support the inference that the promisor did not intend to honor the promise at the time it was made. 664 S.W.2d at 81.

■ The plaintiff argues that this court should infer that the bank did not intend to honor the Security Agreement from the fact that the bank began collection efforts shortly after the agreement was executed. Plaintiff offers no additional evidence to support this inference other than Mr. Sanders' subjective beliefs about the bank's intentions. In deposition, Mr. Sanders testified that he had no evidence concerning when the bank decided to institute collection efforts and that he knew of no facts to suggest that the bank did not intend to honor its obligations at the time it negotiated and executed the Security Agreement. Sanders Deposition at 159–60, 176–77. As a matter of Tennessee law, this evidence is insufficient to support a claim of promissory fraud.[4]

■ Nor has plaintiff presented evidence to support a claim of duress. Economic duress "consists in imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another[.]" *Crocker v. Schneider,* 683 S.W.2d 335, 338 (Tenn.App.), *perm. to appeal denied* (1984) (quoting *Johnson v. Ford,* 147 Tenn. 63, 92–93, 245 S.W. 531, 539 (1922) (quoting *Rees v. Schmits,* 164 Ill.App. 250, 258 (1911))). An involuntary contract made necessary by the fraud and bad faith of the defendant may be void because of economic duress. *Crocker,* 683 S.W.2d at 339. Nothing in the record even remotely supports an inference of bad faith or fraud on the part of the bank in negotiating the Security Agreement. Mr. Sanders has testified that he was not threatened

or coerced into signing the agreement. It is true that he was in a deteriorating financial condition, but that was attributable to the failure of the purchasers of the radio stations to honor their obligations, not to any misdeeds on behalf of the bank.

In sum, plaintiff has failed to prove elements essential to the claims of fraud and duress. Therefore, defendant is entitled to summary judgment on both.

C. Plaintiff's Claim for Breach of Oral Contract Is Precluded by the Parol Evidence Rule.

■ Plaintiff also alleges breach of an oral contract that the bank would refrain indefinitely from attempting to collect on the loans. The Security Agreement specifically states, however, that the bank does not agree to refrain from collection for any specific period of time. This provision is unambiguous. Under the Parol Evidence Rule, proof of an oral agreement may not be offered to vary the plain terms of a written contract. *E.g., Farmers & Merchants Bank,* 664 S.W.2d at 81. Therefore, defendant is also entitled to summary judgment on this claim.[5]

D. Plaintiff Has Failed To Produce Evidence that the Defendant Interfered with the Governance Rights of the Corporate Plaintiffs.

Plaintiff also alleges that the bank tortiously interfered with the governance rights of the corporate entities. In other words, plaintiff claims that the bank interfered in the governance of the corporations without justification or excuse. *Cf., e.g., Lann v. Third Nat'l Bank in Nashville,* 198 Tenn. 70, 277 S.W.2d 439, 440 (1955). But plaintiff has failed to demonstrate that the bank interfered in any manner with the

---

**4.** The discussion above assumes without determining that the bank in fact represented that it would withhold collection for a specific period of time. It should be noted, however, that this assumption has little if any support in the record.

**5.** Plaintiff argues that this rule is inapplicable to claims of fraud and duress. Plaintiff is correct

in arguing that parol evidence is admissible to prove claims sounding in tort for fraud in the inducement or duress. *E.g., Eatherly v. Morc Industries, Inc.,* 585 S.W.2d 631, 636 (Tenn. App.), *cert. denied* (1979). Plaintiff's claim for breach of an oral agreement, however, is distinct from plaintiff's fraud and duress claims, and is subject to the Parol Evidence Rule.

governance of the corporations. Consequently, this claim must also fail.

E. Defendant Bank Is Not Liable for Breach of Its Implied Duty of Good Faith Under the Security Agreement.

Plaintiff points only to the allegedly unusual language of the Security Agreement and to the circumstances under which Mr. Sanders signed the agreement to support its contention that the bank breached the implied duty of good faith created by Tenn.Code Ann. § 47–1–203. The implied duty of good faith, however, goes to the performance or enforcement of the contract, not its execution. *See TSC Industries, Inc. v. Tomlin,* 743 S.W.2d 169, 173 (Tenn.App.), *permission to appeal denied* (1987). Thus, even if the language of the document and the circumstances surrounding its execution were suggestive of bad faith on the part of the bank in executing the agreement, it would not support a claim under Tenn.Code Ann. § 47–1–203.

## CONCLUSION

For the reasons stated above, the Court grants defendants' motion for summary judgment on all claims. All claims are dismissed.