H.S. HUMPHREYS CO., INC., Plaintiff,

v.

BORDEN, INC., Defendant.

No. 91–2410HB.

United States District Court,
W.D. Tennessee, W.D.

March 26, 1993.

---

David M. Sullivan, Law Office of David M. Sullivan, Memphis, TN, for plaintiff.

Lee L. Piovarcy, C. Lee Cagle, Martin, Tate, Morrow & Marston, Memphis, TN, for defendant.

## ORDER DENYING PLAINTIFF'S MOTION TO ALTER OR AMEND PREVIOUS ORDER GRANTING SUMMARY JUDGMENT

HORTON, Chief Judge.

Plaintiff filed a three-count complaint against defendant and an additional party alleging breach of contract, fraud, and tortious interference with contractual rights. On December 11, 1991, plaintiff submitted a consent order dismissing with prejudice the allegation of tortious interference as to the additional party. The allegations of breach of contract and fraud remained against the defendant until this Court entered its order granting defendant's motion for summary judgment on September 11, 1992.

Consequently, plaintiff filed a motion to set aside and vacate the dismissal claiming that it had not received an opportunity to file a supplemental response to the motion for summary judgment. Although this Court consented to plaintiff's filing of its supplemental response within 30 days of the filing of the remaining defendant's employees, the order was signed with the understanding that the depositions were to be taken in June and the motion would be filed in July. However, as of the date of the Court's entry of dismissal in September, plaintiff made no attempt to file its response or to notify this Court of its inability to file its supplemental response. Accordingly, the Court based its consideration of the motion for summary judgment upon the pleadings and record received at the time.

On September 14, 1992, plaintiff filed a motion to set aside and vacate the order for summary judgment. Upon reviewing the motion to vacate the dismissal, the Court decided to hold the order for summary judgment in abeyance for a period of sixty days in order to allow plaintiff to file its supplementary response. On November 12, 1992, plaintiff filed its supplemental motion in addition to depositions and affidavits in support of the record. Accordingly, this Court considered defendant's motion for summary judgment *de novo* based upon the entire record, including the additional pleadings of plaintiff and defendant.

FACTS

The complaint, in the above-styled action, stems from a contractual relationship which existed between plaintiff and defendant from 1977 until 1991. At the time of the relationship, plaintiff was the exclusive broker for the sale of certain products of the defendant in specified counties of Arkansas, Mississippi, and Tennessee. However, in 1986 and 1987, plaintiff learned that defendant's products were being diverted into its territory from other regions.[1]

Diversion occurs when brokers or wholesalers sell or resell product in other territories. According to the pleadings and the various affidavits and depositions, diversion is an industry-wide problem which has been in existence since the 1960s and which results from several factors. In some cases, products are "transferred from a region in which relatively large trade discounts or allowances are offered to areas or regions where the same goods are offered at higher net prices." Affidavit of Robert D. Buzzell, p. 1.

In other cases, a wholesaler may misapply market development funds, received for the performance of certain objectives, in order to resell the goods at a lower cost. Deposition of Jon G. Hettinger, p. 41. Wholesalers also purchase product in promotion quantities, with the promise to advertise or display the goods. *Id.* at 44. Instead, they divert the goods to other accounts or to parties engaged solely in the diversion business. *Id.* Wholesalers may also divert product as a means of reducing their inventory but charge the same price the buyer could receive from a broker. Deposition of John F. Dix, p. 169. The benefit to the purchaser appears to be the ability to receive a variety of products from different manufacturers in quantities smaller than a broker can sell. *Id.* at 170.

Parties also participate in diverting product without the need for different pricing and promotional activities on the part of the defendant. In some instances, brokers may apply their commissions or other manufacturer's market development funds on products in order to reduce the net case price which is the invoice cost less the misappropriated funds. *Id.* at 88. An employee of

defendant also cited an example in which plaintiff's account rejected an offer to purchase product from plaintiff in favor of goods from a diverter at a higher price. *Id.* at 88. Thus, this Court has been presented with a variety of ways in which diversion occurs.

Accordingly, in Count I, plaintiff alleges that defendant breached its contract by permitting, encouraging, and promoting third parties to sell products of which it was the exclusive representative. Count I also includes additional charges to the declared breach of contract. According to plaintiff, defendant:

(1) knew or should have known of the diversion due to market projections indicating that sales exceeded consumption in certain territories; (2) encouraged the sale of large quantities in knowing or conscious disregard of the diversion; and, (3) breached the contract by selling at lower prices in regions knowing that the "only way those products would be resold was through diverters."

In Count II of the complaint, plaintiff also argues numerous means by which defendant perpetrated a fraud. First, it claims that as defendant sold large quantities of products through certain brokers and diverters it intentionally misrepresented the provision that plaintiff was the exclusive representative. Plaintiff also asserts that defendant intended to deceive plaintiff into continuing relations by promising to "take action to control and prevent the diversion of [its] product in plaintiff's territory." As a result, plaintiff maintains that it relied upon the representations, and abided by the contract.

Defendant, however, disputes plaintiff's claims, and filed a motion for summary judgment. The motion states the following bases for relief:

1. "That no duty exists, or ever existed, on the part of Borden to guarantee that no Borden products would be sold in plaintiff's territory by a third party and that the contract between Borden and plaintiff contains no such guarantee;"

---

1. This Court refers to diverted goods as product which is resold to any party other than the retailer who is affiliated with a particular wholesaler or the end consumer.

2. "That the terms of the contract establish that there was no intention of Borden or plaintiff to require Borden to monitor the activities of third parties in plaintiff's territory;"

3. "That, at all times pertinent hereto, Borden acted in good faith in its relationship with plaintiff, and plaintiff cannot demonstrate otherwise;"

4. "That plaintiff's complaint is replete with vague and conclusory allegations of fraud which are not supported by the undisputed facts of this case;" and,

5. "That, as a matter of law, plaintiff is not entitled to punitive damages."

Thus, this Court must determine whether the record supports defendant's contentions.

According to the Sixth Circuit, summary judgment is appropriate in breach of contract cases if plaintiff as the non-moving party fails to establish a genuine issue of material fact on an element essential to its case and on which it would bear the burden at trial. *Eyerman v. Mary Kay Cosmetics*, 967 F.2d 213, 217 (Sixth Cir.1992). In addition, the appellate court requires the finder of fact to view the evidence in the light most favorable to the plaintiff. *Id.* If, however, the finder of fact could reasonably rule in favor of the plaintiff, the motion will be denied. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## BREACH OF CONTRACT CLAIM

■ Plaintiff relies upon the express contractual obligations and the implied duty of good faith in order to demonstrate the existence of a breach of contract. The 1981 contract provides that defendant appointed plaintiff "as its sales representative for products in the geographical area." Brokerage Agreement, 1/1/81, p. 1. The parties also agreed that:

"A BROKER in whose territory a purchaser's buying office is located shall have

sole and *exclusive* rights to solicit orders for BORDEN products unless otherwise provided by BORDEN in writing. A BROKER in whose territory a shipping address is located shall have the first option to provide retail services, unless otherwise mutually agreed upon by BORDEN and BROKER in writing." *Id.* at 2.

In reviewing the contract and the pleadings, this Court is unable to determine that defendants breached its express contractual obligations. In reaching this decision, the Court is persuaded by the Middle District Court of Tennessee decision of *Fen Hin Chon Enterprises, Ltd. v. Porelon, Inc.* In *Porelon*, a licensee brought action for breach of an exclusive licensing agreement. 667 F.Supp. 1174 (M.D.Tenn.1987). The Court wrote that defendant's sale of product to plaintiff's competitor violated the exclusivity provision of their license. *Id.* at 1185.

In the case at bar, there is no evidence of a sale with the intent to violate the exclusivity clause. Although there is testimony that third parties diverted product sold by plaintiff and other brokers to accounts into other territories, nothing suggests that sales were made directly to Wilco Company or Brothers Trading Company, the companies plaintiff identified as diverters.[2] Dix Deposition at 8. The evidence also fails to imply that defendant intended to supply parties whose primary business was diverting or wholesalers who planned to divert.[3] As plaintiff failed to demonstrate an intent to breach the contract and the practice of diversion existed prior to the contract's formation, the Court fails to find that defendant expressly violated the exclusivity clause.

■ While there was no express breach of contract, the Courts of Tennessee also require a determination of whether a breach of the contract's implied duty of good faith and

---

**2.** The term "diverter" takes on several different meanings in the pleadings. At times, parties define diverters as organizations whose only function is to purchase goods through sources other than the manufacturer and resell them on the open market to wholesalers and retailers. At other times, the term refers to wholesale or retail accounts who engage in diverting goods as a means of boosting their profit margin. In addition, "diverter" may also refer to a broker who

intentionally or unwittingly aids the diversion of product.

Generally, this Court will use the term inclusively in order to describe the parties previously mentioned.

**3.** Defendant assembled a list of known diverters whose business was not that of a wholesaler or retailer, but strictly a diverter.

fair dealings occurred. *Oak Ridge Precision Industries, Inc. v. Tennessee Bank National Association,* 835 S.W.2d 25, 29 (Tenn.App. 1992). Although plaintiff believes the duty prevents defendant from doing anything which might impair the contract, the duty is actually construed according to the individual contract and the facts of the case. *Id.* In reviewing a Sixth Circuit decision which contemplated a charge of breach of the duty of good faith and fair dealing, the appellate court determined that the analysis requires consideration of the reasonableness of the business decision.[4] *Davidson v. Cincinnati Milacron Inc.,* 966 F.2d 1451, *2 (Sixth Cir. 1992) (unpublished).

■ Plaintiff basis its conclusion upon the statements of Douglas E. Johnson, a former regional manager for defendant, and Robert D. Buzzell, a professor of marketing at Harvard University Graduate School of Business. In his affidavit, Mr. Johnson stated that "the most obvious and effective step to stop the diversion of [defendant's] products ... was to eliminate or control the practice of offering special promotions in only select territories." Affidavit of Douglas E. Johnson, p. 5. He also believes that "Borden's response to the diverting problem was completely ineffective and was not calculated to prevent the diversion of its products from occurring but was only reactive to the diversion after it had occurred."[5] *Id.*

Professor Buzzell also states that defendant's promotional policies and practices enabled the diversion. Affidavit of Robert D. Buzzell, p. 2. According to his affidavit, the diversion could be prevented by controlling the promotional practices.[6] In his opinion,

"Borden could have instituted effective measures to control and prevent the diversion of its products by placing restrictions on the quantities bought by its customers during periods when trade promotions were in effect. The restrictions could have been based on estimates of reasonable consumer purchases in the area where the promotional discount or allowance was offered.

In order to control and prevent "inbound diverting" Borden could have instituted a policy of giving all competing distributor customers within the same area an equal opportunity to qualify for the prices terms, promotions, and deals that it offered to non-food accounts." *Id.* at 3.

Although the affiant identified the defendant's practice of paying commissions on a sliding scale and its pricing policies with regard to other regions as attributing to the diversion, he failed to discuss whether defendant could reasonably amend that particular behavior. *Id.* at 2.

In order to determine whether defendant's conduct stemmed from a reasonable business decision, this Court must examine the basis of Professor Buzzell's opinion. The affiant read the complaint, the answer and the depositions of Jon Hettinger, John Dix, Sam Viar, Austin Noll and C.M. Greenwood in order to reach his conclusions. *Id.* at 2. However,

4. As the Federal Rules of Civil Procedure and the Sixth Circuit prohibit a trial court from weighing the evidence when considering a motion for summary judgment, this Court restricts its review to whether the record contains facts that defendant's conduct was unreasonable, and whether the facts will enable plaintiff to bear the ultimate burden at trial.

5. Johnson refers to the credit-debit policy as Borden's response to the diversion problem.

The credit-debit policy was detailed in a letter to all brokers dated May 22, 1990. According to the deposition of John Dix, Borden's Broker Advisory Committee agreed to the institution of the policy. According to the policy, product sold by any broker which was diverted into another broker's territory would result in the debiting of that broker's account with a corresponding credit to the broker whose territory received the diverted

goods. Defendant refused, however, to credit a broker's account unless the broker could present specific proof of the diversion and defendant could make a corresponding debit to another broker's account.

Proof of the system's operation may be found in credits received by plaintiff for diverted product found within its territory. On November 9, 1990, plaintiff received a credit of $2,155.14. Defendant also credited plaintiff's account in the amount of $2,028.89 on January 9, 1991. Yet, two months prior to the plaintiff's termination of the agreement, its account was debited for over 1,000 cases of product which it sold to an account that diverted the product into another territory.

6. Professor Buzzell's testimony differs from Mr. Johnson's in that the professor believes defendant could prevent diversion by controlling, rather than eliminating, its promotional practices.

there is no indication that Professor Buzzell reviewed defendant's price lists or promotion offerings in order to determine that it would have been a reasonable business decision to amend its policies with regard to food and non-food accounts.

In considering a motion for summary judgment, this Court is prevented from relying upon "conclusory allegations." Fed.R.Civ.P. 56(e). Thus, when affiant relies upon plaintiff's statement that pricing differentials exist without reviewing objective evidence such as price lists or promotion offerings, he is asking this Court to base its order upon mere allegations.[7] In addition, this Court is also presented with the deposed statement of John Dix.

In answer to a question as to whether non-food and food accounts pay the same prices, he responded, "All customers, to my knowledge, buy from a price list, and the price list is the same for all customers." Dix Deposition, p. 125. Dix also said that the defendant engages in a national pricing practice although promotions are determined by market. Id. at 10. After defendant supported its motion for summary judgment, plaintiff should have "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

Plaintiff also failed to set forth a genuine issue for trial with regard to Professor Buzzell's suggestion that it would have been prudent for defendant to restrict the quantities shipped during promotional periods as a means of controlling diversion. Buzzell Affidavit, p. 3. Thus, it would appear as if the affiant would consider the defendant's conduct reasonable if it restricted promotional quantities. In point of fact, defendant's employees discussed their use of that particular method of control in the depositions examined by the affiant.

John Dix described one example of defendant's attempt to control diversion in his deposition. In approximately 1989, defendant restricted the amount shipped of one Wyler's Bouillon by utilizing a formula which allowed the account to purchase relative to what was bought in the prior year. Dix Deposition, p. 78. Jon Hettinger's deposition also contains an example of defendant's attempt to restrict shipments.

According to Hettinger, the defendant is doing its "dead-level best" to police the offers of accounts who are known to divert. Hettinger Deposition, p. 44. He states that accounts may say that they are reducing the price to the consumer in order to justify a large order.[8] Id. However, even when defendant restricts the amount shipped, accounts continue to divert the goods. Id. Thus, the record contains two examples wherein the defendant already practices the measures suggested by the professor as a reasonable means of controlling diversion.

The remaining issue as to the reasonableness of the defendant's conduct stems from the statement of Douglas Johnson regarding defendant's method of debiting an account which diverts and crediting the territory receiving the diverted goods. According to Johnson, the policy was ineffective in preventing diversion. Johnson Affidavit, p. 5. If the credit-debit policy was the only means of attempting to control or prevent diversion, there would be a genuine issue of material

---

7. Using the statement of plaintiff's employee as sole evidence of a price discrepancy is inappropriate. The plaintiff possessed the burden of presenting objective evidence that differences in price did not stem from differences in the volume shipped. This Court is not prepared to take the same leap of faith as Professor Buzzell and assume that all plaintiff's allegations are well-founded.

In addition, it is also possible to assume that any differences in price resulted from the fact that defendant does not consider accounts in the food and non-food to be in competing markets. As defendant made allowances so competing customers within the same territory might receive proportionally equal promotions, it is reasonable to assume that the competitive market philosophy extended to the pricing structure. 1981 Broker Agreement, p. 3. However, there is no indication that the professor considered whether any differences stemmed from a reasonable business decision.

Accordingly, as plaintiff possesses the burden of showing a material issue of fact, the failure to address the market structure causes the Court to question whether plaintiff will be able to bear its burden of proof at trial that defendant's conduct was not commercially reasonable.

8. Manufacturers who produce and sell consumer goods believe consumer sales increase if the goods are displayed, advertised, and/or the price is reduced.

fact as to whether defendant acted in a reasonable manner.[9]

However, there is evidence in the depositions of Dix and Hettinger which neither the affiant nor the plaintiff addressed. According to the depositions, defendant utilized a variety of measures to control diversion. The evidence indicates that defendant:

1. changed the labeling and the uniform product code of Eagle Brand Milk in order to halt the diversion of the product from the Puerto Rican market; Hettinger Deposition, p. 24.

2. terminated a broker for knowingly creating a diversion; *Id.* at 40. Dix Deposition, p. 25.

3. terminated brokers for mishandling funds which could lead to diversion; *Id.*

4. attempted to trace case codes in order to identify the source of the diversion; *Id.* at 44.

5. stopped doing business with a list of known diverters; Dix Deposition, p. 19.

6. received the agreement of the Borden Broker Advisory Committee with regard to the debit-credit policy; *Id.* at Exhibit 64.

7. paid the broker whose account received diverted product a full commission for retail work performed. *Id.* at 44.

8. monitored the expenditure of accrual and market development funds through use of sales auditors who visited the broker's offices on a regular basis; *Id.* at 88.

9. adopted many of the recommendations of the National Food Broker's Association with regard to stopping diversion; *Id.* at 132.

10. randomly stamped cases with the purchaser's invoice code; *Id.* at 157.

11. used sequential coding and the expiration code as a means of tracking cases of the product; *Id.* at 156.

12. paid funds only after the broker verified performance; *Id.* at 187.

13. determined promotion offerings by empirical evidence such as market share data, consumer consumption data, attitude and usage data, and other market research which was received from Nielsen's, IRI, outside suppliers and various other means; Hettinger Deposition, p. 36.

14. required all brokers to aid in the prevention of diversion by "furnish[ing] Borden [with] any information which may be requested regarding the solicitation of sales of BORDEN products within the territory or such other information relating to BROKER'S performance under this agreement;" 1981 Broker Agreement, p. 2.

15. compelled brokers to "take reasonable precautions to see that services for which allowances may be paid are actually furnished by purchasers and that there is no overpayment for such services." *Id.* at 3.

The facts fail to support plaintiff's allegation that defendant breached the implied duty of good faith and fair dealing as defendant attempted to control diversion by restricting shipments, as suggested by Professor Buzzell, and using other methods which plaintiff neglected to discuss.

## FRAUD CLAIMS

■ With regard to the claim that defendant intentionally misrepresented the exclusivity clause by actual or constructive fraud, this Court relies upon *Keith v. Murfreesboro Livestock Market, Inc.* In *Keith,* the court maintained the generic definition of fraud. 780 S.W.2d 751, 754 (Tenn.App.1989). Thus, fraud is defined as:

"[A]ll acts, omissions, or concealments which involve a breach of legal and equitable duty, trust or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken." *Id.*

As a result, the evidence must demonstrate the violation of one of the *Keith* elements in order to defeat the motion for summary judgment.

---

9. The credit-debit policy was detailed in a letter to all brokers dated May 22, 1990. It became effective with shipments dated after July 1, of the same year. Proof of the system's operation may be found in credits received by the plaintiff for diverted product found within its territory. On November 9, 1990, plaintiff received a credit of $2,155.14. Defendant also credited plaintiff's account in the amount of $2,038.89 on January 9, 1991. Yet, two months prior to the plaintiff's termination of the agreement, its account was debited for over 1,000 cases of product which it sold to an account that diverted the product into another territory.

If plaintiff is to bear the ultimate burden at trial, the record must reflect that:

1.  defendant intentionally misrepresented that plaintiff was to receive the exclusive right to represent Borden;

2.  defendant knew that plaintiff would not be its sole representative;

3.  plaintiff was injured by reasonably relying upon defendant's statement;

4.  the misrepresentation related to an existing fact.  *Id.*

Upon consideration of the pleadings and in viewing the evidence in the light most favorable to plaintiff, the Court grants the motion for summary judgment with regard to the issue of actual or constructive fraud.

The analysis does not compel a finding that defendant intentionally misrepresented the exclusivity clause.  Plaintiff appears to believe that fraud exists because third parties sold defendant's product in their territory.  This Court, however, is not convinced.

The broker's contract is explicit as to the rights which were granted by the defendant.  Plaintiff received defendant's "blessing" to represent its products in a specified territory.  The record is completely silent as to any allegation that defendant also gave its "blessing" to any of ·the diverters.  In fact, the record clearly establishes that defendant approached plaintiff's accounts, and told them that plaintiff was its representative in that area.  Accordingly, plaintiff wishes to hold defendant liable for fraud due to the unauthorized activities of a third party over which defendant has no control.

The Court must also consider whether the third parties acted in a representative capacity.  If they failed to represent defendant according to the expectations of the broker's contract, then there is no representation at issue.  According to *Black's Law Dictionary,* a representative is "one who represents or stands in the place of another.  One who represents others or another in a special capacity, as an agent." 1170 (5th ed. 1979).  A representative is also defined as one who is "[a]uthorized to act as an official delegate or agent." *The American Heritage Dictionary,*

1049 (2d ed. 1982).  Nothing in the record suggests that diverters, such as Wilco Company or Brothers Trading Company, or wholesalers engaged in diverting represent the interests of the defendant.

Defendant's representatives do more than simply sell product.[10]  They possess the power to bind Borden contractually.  The representatives also appear to speak for defendant in the individual territories.  Furthermore, plaintiff's position as Borden's representative grants plaintiff the standing to bring this action.  The parties reselling Borden product in plaintiff's territory possess no such standing as Borden owes them no express or implied obligation.  Therefore, this Court cannot state that Borden misrepresented plaintiff's status as its exclusive representative.  As the evidence fails to demonstrate that an intentional misrepresentation existed, this Court must grant the order of summary judgment with regard to the claim of actual or constructive fraud.

■  In considering the allegation that defendant is liable for promissory fraud, this Court finds *Sanders v. First National Bank in Great Bend* applicable.  114 B.R. 507, 516 (M.D.Tenn., 1990).  In order to prevail pursuant to *Sanders,* plaintiff must demonstrate:

"(1) a representation of an existing or past fact rather than an opinion concerning future events, (2) that is false and material, (3) made knowingly, recklessly, carelessly or without belief in its truth, (4) upon which the plaintiff reasonably relies, and (5) which proximately causes damage to the plaintiff." *Id.*

The primary distinction between *Keith,* which considered actual or constructive fraud, and *Sanders,* which examined promissory fraud, is that *Keith* requires an "intentional misrepresentation," while *Sanders* lessens the standard to a "carelessly" made statement.

Plaintiff contends that defendant carelessly promised to "take action and control diversion" without believing in its ability to do so.  The position is supported by a former em-

---

10.  The record demonstrates that diverters possessed the ability to resell product in limited quantities.  There is no indication that they would have been able to provide the benefits of an authorized broker (ie. advertising support, immediate notification of product recall, performance allowances, access to the defendant).

ployee of the defendant, Douglas Johnson who believed the credit-debit policy was ineffective. In response, defendant states that "it has not and cannot guarantee total elimination of diversion."

After reviewing the pleadings and the relevant case law, the Court fails to find a promise that defendant would prevent diversion. However, even if the Court *assumes* that defendant implied that it possessed the capacity of absolutely eliminating diversion, plaintiff failed to present evidence that the fifteen other diversion programs, which this Court previously cited, were equally ineffective.[11]

To the contrary, the record demonstrates that certain programs were highly effective. For instance, the actions taken with regard to the diversion of milk from Puerto Rico appear to have stopped that particular problem. Hettinger Deposition, p. 10. In addition, the termination of brokers who knowingly divert product also closed other diversion pipelines. *Id.* at 40. Despite the numerous examples demonstrating that defendant took action to control diversion, plaintiff addresses only one.

█ Plaintiff appears to argue that the only way in which defendant could have accomplished its promise would have been to eliminate micromarketing [12] and standardize all pricing and promotions. The evidence, however, demonstrates that defendant could achieve its goals by other means. Thus, defendant is not liable for promissory fraud merely because it attempted to meet its objective in a manner different than that desired by plaintiff.

In addition, this Court will not permit plaintiff to sit back and rest on its laurels when defendant presents evidence demonstrating that it is not liable for promissory fraud. Plaintiff possesses the burden at trial to show that none of defendant's measures

were intended to control the diversion problem. Yet, as it failed to set forth specific facts showing a genuine issue for trial, an order for summary judgment is appropriate. Fed.R.Civ.P. 56(e).

CONCLUSION

This action brings to the judicial arena a situation which involves more than this plaintiff and this defendant. It involves a game played by the entire food and non-food grocery industry for over 30 years. Some of the players participating were invited into the game while others simply showed up. Plaintiff was in the game for almost seven years before it realized the field had been crowded for 26 years with uninvited players. If it no longer wishes to play, it may exercise its option to leave. However, this Court is a mere spectator. And, it will remain in the bleachers as long as the participants play fair.

In the case at bar, no contract has been breached and no fraud has been committed. As there is no genuine issue of material fact with regard to the following issues of: breach of contract; breach of the implied duty of good faith and fair dealing; actual or constructive fraud; and promissory fraud, this Court herein grants defendants' motion for summary judgment. It is so Ordered.

---

11. Although the Court considered the possibility that plaintiff *believed* defendant intended to eliminate diversion completely, it is not a reasonable inference in light of the 30 year history of the problem and its widespread impact upon the entire food and non-food grocery industry.

12. Hettinger Deposition, p. 27–28. Hettinger presented an example of micromarketing using Eagle Brand sweetened condensed milk. "[T]he south and the southeast are relatively high-developed, high-consumption markets for condensed milk. On the other hand, Boston is a low-consumption market for condensed milk. It might be entirely conceivable that Boston would have a totally different orientation to its marketing plan in order to try to lift the consumption of milk up there." As a result of differences in consumption, defendant attempted to "meet the strategic directions of the local customer."