**Morris CROCKER, Plaintiff-Appellee**

**v.**

**Anne H. SCHNEIDER, Baxter H. Turnage, Jr., and Confederated Housing Associates, Inc., Defendants-Appellants.**

Court of Appeals of Tennessee,
Western Section,
at Jackson.

Sept. 28, 1984.

Application for Permission to Appeal Denied by Supreme Court
Dec. 17, 1984.

W. Emmett Marston and J. Philip Jones, Memphis, for defendants-appellants.

Whit LaFon and David Hardee, Jackson, for plaintiff-appellee.

NEARN, *Presiding Judge*, Western Section.

Plaintiff filed suit to have certain agreements declared void on the grounds that they were entered into under economic duress, to have certain funds being held in escrow declared to be the funds of the plaintiff and for recovery of monetary losses suffered. The Chancellor found for the plaintiff and awarded the escrow fund to the plaintiff as well as a recovery for monetary loss.

Plaintiff was the majority stockholder of the corporation which owned the property formerly known as the New Southern Hotel located in Jackson, Madison County. He also operates Morris Crocker Construction Company. The defendant Anne Schneider is no longer a party to this litigation as she was only the escrow agent or stakeholder and has paid the funds she held into the registry of the Court and has been dismissed. The defendant, Baxter H. Turnage, Jr., is in the construction business and is the owner of Confederated Housing Associates, Inc., his alter ego. Therefore, in the course of this opinion, the term "defendant" shall mean Baxter H. Turnage, Jr.

The defendant-appellant states the issues on appeal to be:

I. Did plaintiff-appellee, Morris Crocker, sign a February 15, 1978, agreement and a June, 1978, escrow agreement under wrongful or illegal duress caused by defendant-appellant Baxter H. Turnage, Jr.?

II. Did plaintiff-appellee, Morris Crocker, ratify the written agreements and is he therefore estopped from asserting duress and denying their validity?

The plaintiff-appellee does not contend that the issues are otherwise.

The undisputed facts are that plaintiff and defendant met sometime in the year 1975 to discuss the possibility of obtaining funds for the renovation of the New Southern Hotel. For a number of years the New Southern Hotel had not been operated on a profitable basis. Previously, plaintiff had made an unsuccessful attempt to obtain financing through a government agency for rehabilitation of the hotel. The plaintiff knew that defendant had certain expertise in the field of government financing as the defendant had previously constructed and handled projects financed through government funds. It is further undisputed that after several meetings it was agreed that the two would form a joint venture or partnership to obtain funds for the New Southern Hotel "project." As will later be seen, a principal dispute is over the meaning of the word "project."

There is no dispute over the fact that the defendant met with government officials and did the necessary paper work with the assistance of the plaintiff to present a feasible financial "package" and plan to government officials to obtain what is termed a Section 8 H.U.D. loan. The defendant did all that was required in this area, and plaintiff has no complaint regarding defendant's efforts.

The defendant had prior successful relations with the government agencies in such

matters, and the parties decided that plaintiff and defendant should be shown as "co-sponsors" of the project. In order to obtain financing, co-sponsors were required to have an interest in the property sought to be improved. Therefore, plaintiff gave defendant an option to purchase the New Southern Hotel for $250,000.00. No payment was made for the option, but it evidently satisfied government regulations regarding ownership. The plan was that the New Southern Hotel would be converted into a Senior Citizen facility with low rents to be financed by the government agency with the owner(s) furnishing the land and building. Applications to government agencies were initially made in the name of defendant.

The "co-sponsors" also planned to have the New Southern syndicated as a limited partnership; the plaintiff and defendant were to be the general partners and limited partnership interests would be sold to others. Under this procedure the old New Southern Motor Hotel, Inc., when converted, would be sold to the limited partnership and out of the proceeds received from those partnership interests, plaintiff would receive $250,000.00 for the hotel land and building and any overage from this syndication would be split by plaintiff and defendant. Plaintiff was also to be the general contractor on the renovation work and would receive payment for his work from the government loan. All agreements between plaintiff and defendant to this point were oral.

Several months before the construction loan was to be closed, the governmental agency indicated to the "co-sponsors" that the presence of the defendant as a "sponsor" violated their guidelines as the defendant was also a sponsor of other projects (none of which involved the plaintiff) and the number of units in which the defendant was involved exceeded their loan policy. Accordingly, both were notified that unless the defendant was removed as a sponsor, the loan would not close. It was at this time that the defendant began to insist that their agreement be reduced to writing.

The day of the construction loan closing, the plaintiff signed an agreement with defendant which provided that it superceded all prior agreements, provided that defendant would no longer be considered a sponsor of the project and waived all rights he had in it for the payment of $59,188.00, to be paid to defendant by plaintiff at the final settlement of the project twenty-two months later. In order to secure this payment, plaintiff signed an escrow agreement between the escrow agent, plaintiff, defendant, and the limited partnership that provided the manner by which the proceeds of the sale of the partnerships were to be distributed. At the final closing of the project, when the funds were paid in by the limited partners, the plaintiff sought and was granted an injunction restraining the escrow agent from paying to the defendant the amount provided for in the escrow agreement. All other parties, including the plaintiff but excluding the defendant, received their share as provided in the escrow agreement. The defendant's share was paid into Court as mentioned above.

The Chancellor in part found:

> From all of the proof, and the Court does not really understand why, the defendant had gained a dominant position in the fiduciary relationship between the parties. It appears that while both parties are experts in the handling of Federal housing projects, in this particular venture, the defendant was handling the paper and financial connections, and the plaintiff was handling the actual construction of the project.
>
> In such a situation, a presumption arises that where a party in the dominant position receives benefits, that an improper advantage was taken. Any such presumption and invalidity of such transaction has to be overcome by clear and convincing proof. It may become practice in these types endeavors where one side is guaranteed a considerable profit with no consideration, and the other party assumes all the liabilities.
>
> After the construction loan was closed, the plaintiff was asked to enter into an

escrow agreement which would guarantee the defendant his funds, the plaintiff refused at first, but facing the same identical facts that faced him at the loan closing, the plaintiff signed the escrow agreement.

Subsequent to all the closings and when the parties realized that a tremendous loss had been suffered, the plaintiff attempted to have the defendant pay the escrow money toward the losses on the venture. The defendant refused. The plaintiff, according to the complaint, lost $80,479.00, and the total loss on the venture itself was $517,168.00.

We respectfully disagree with the Chancellor and find that the evidence preponderates against his material findings and that his conclusions are, therefore, in error.

The Chancellor candidly stated that the defendant had gained a dominant position for reasons unknown to the Court. We, too, are unable to find a reason, but further find that no such dominant position existed.

Up until the time that the governmental agency required the removal of defendant's interest in the project, the parties were operating under an oral agreement, but because of circumstances each was more or less in equal control of the situation. Before the written agreement was executed, the New Southern was titled in the name of plaintiff's corporation, plaintiff's building corporation was the government-approved building corporation and plaintiff was listed as a co-sponsor of the project. The defendant was listed as a co-sponsor and, as such, could contemplate having some control over final disbursements of funds. Further, it is admitted that under the oral agreement both were to have been general partners in the limited partnership syndication to be formed upon completion of the project.

It was only when the government agency insisted that defendant be removed as a sponsor of the project that any real inequality began to appear. With the defendant's name removed from the project, complete control would fall to the plaintiff, leaving the defendant with only an oral agreement with the plaintiff as security for the work he had performed under that oral agreement. Therefore, defendant insisted that the agreement be reduced to writing and his interest be spelled out. In short, circumstances beyond his control had placed defendant "in a bind."

On the other hand, plaintiff's dilemma was that if defendant was not removed from the project, the construction loan would not close, the deal would fall through and plaintiff would face possible financial ruin. The requirement of the lender that defendant withdraw as co-sponsor had placed both parties "in a bind." This being true, we do not believe the presumption indulged in by the Chancellor of the defendant's dominant position has ever arisen.

Under these circumstances, the defendant had an instrument prepared in which, for a stipulated sum, he waived all his interest in the project including his right to be a co-sponsor of the project and a general partner in the limited partnership syndication. This sum was arrived at by an estimation of the profits derived from the project. This agreement was delivered to plaintiff who considered it for several months but did not sign it. As the day for the closing of the construction loan drew near, defendant advised plaintiff that if he did not sign the agreement that he, the defendant, would do all he could to stop the loan closing.

Plaintiff's case for "duress" is built upon this admitted statement of the defendant. We hold that under the facts this is not a case of "economic duress."

Economic duress has been defined as: imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another; the theory under which relief is granted being that the party profiting thereby has received money, property or other advantage, which in equity and good conscience he ought not to be permitted to

> retain. *Johnson v. Ford,* (1922) 147 Tenn. [(20 Thompson)] 63, 92–93, 245 S.W. 531, 539 (quoting *Rees v. Schmits,* 164 Ill.App. 250, 258 (1911))

and, more succinctly, as: "an involuntary payment made necessary by the fraud and bad faith of the defendants." 147 Tenn. at 96.

This case fails of those requirements. First, it as admitted that defendant was not the party imposing the requirement that defendant be disassociated from the project. Second, it is further admitted that had defendant not disassociated himself from the project, the construction loan would not have closed. Defendant's so called "threat" was meaningless. Had he said nothing to the government agency and, in fact, attempted to assist in the construction loan closing, it would have been of no avail—because it is admitted that, regardless of any action taken by defendant, the loan would not have closed as long as defendant was associated with the project. This situation was not caused by defendant. Further, both parties admit an oral agreement. There is certainly nothing wrong in insisting that an oral agreement be reduced to writing. Defendant had every right to insist upon his legal right. The insistence of one party on a written agreement does not constitute an undue advantage.

Of course, duress or not, no one has the right to insist upon reducing to writing that which was not agreed upon. This brings us to the context of the oral agreement. The defendant's position was that all profits from the "project" were to be split fifty-fifty and that, in fact, there were no losses. The defendant defined the "project" as the obtaining of the construction loan and the syndication and sale of the limited partnership. Assuming that the construction loan was obtained, that the limited partnership syndication was accomplished, by which the limited partners would purchase from plaintiff the Senior Citizen facility for a sum in excess of the $250,000.00 value of the hotel, and that the amount due the construction contractor (plaintiff) and loan commitment expenses and other incidental expenses were paid, there could be no loss. In fact, the limited partnership did pay in excess of those figures. Therefore, when defendant was forced to withdraw, defendant computed the estimated excess and, in the written agreement, agreed to withdraw in return for 50% of that amount.

In our examination of the record we find the plaintiff's testimony on the subject of the oral agreement to be ambivalent and, in some instances, contradictory and implausible. In comparison, the defendant's testimony in that regard is clear, cogent and convincing. We believe the plaintiff contends that the "project" was to be a joint venture with everything, profits and losses, to be split fifty-fifty, including all losses suffered by plaintiff from the operation of his hotel. The plaintiff insisted that there were no profits because he lost money on the operation of the hotel both before and during the construction period (just as he always had), and that he lost money on the construction work because of either delays or underbidding on his part.

Under plaintiff's theory of the oral agreement, the "project" consisted of the limited partnership, the hotel and the construction contract. The proof shows, however, that defendant had nothing to do with either the construction rehabilitation work or the operation of the hotel. Yet, plaintiff wants the defendant to share in his operational losses on the hotel as well as his construction losses, contending that that was part of their oral agreement. Those operational losses that plaintiff has charged to defendant include over $30,000.00 in back taxes owed on the hotel. Further, plaintiff never offered to give a warranty deed to defendant for a one-half interest in the hotel, which he would certainly have been entitled to under the agreement espoused by the plaintiff. The only thing plaintiff gave to defendant was an option to buy the hotel at its full value. That is certainly inconsistent with 50% ownership. There are other inconsistencies and implausibilities, but we see no need to

dwell on this point. In addition, it is undisputed that when defendant submitted the written agreement, plaintiff made no counter offer or ever even stated to the defendant that the agreement was not correct. We find the oral agreement as that contended by the defendant.

If we are wrong in our findings on the oral agreement, we would still reverse the decree below on the grounds that plaintiff is estopped to claim duress because he ratified the agreement. For twenty-two months after the alleged "duress," plaintiff chose to operate under the written agreement. In fact, the proof shows that prior to the signing of the agreement, plaintiff began the syndication of the limited partnership, making himself the sole general partner. Plaintiff operated as the sole sponsor and sole owner of the project. Some five months after the written agreement was signed, an escrow agreement was prepared by one of plaintiff's lawyers, providing for payment to defendant of the previously agreed upon amount from the syndication closing. Prior to signing it, plaintiff voiced no objection, but maintained at trial that he was under the same financial pressure or duress as had existed when he signed the original agreement. We have found that no such duress existed originally, and the same certainly did not exist after the closing of the construction loan. It was not until just before the day of the final syndication closing that he went to court to obtain an injunction barring defendant from receiving payment under the escrow agreement. We hold that the signing of the escrow agreement ratified the previous agreement. See *Russell v. Zanone,* (1966 W.S.) 55 Tenn.App. 690, 703, 404 S.W.2d 539, at 544–45 (quoting *Landreth v. Schevenel,* (1899) 102 Tenn. 486, 493 52 S.W. 148, 149.)

The Chancellor held that plaintiff was entitled to the escrow funds agreed to be paid to defendant. In addition, he held defendant liable for approximately 50% of hotel and construction losses suffered by plaintiff, yet awarded no interest in the project to defendant. Such decree is inconsistent with plaintiff's theory in our view. If defendant was to share in all losses, he should also share in all profits or interests. As it stands, plaintiff has an interest in the limited partnership and, under the decree, the defendant has none but pays one-half the losses. We accordingly must reverse.

We hold that the written agreement and escrow agreements are binding on the plaintiff and that defendant is entitled to the funds held in escrow for him. Further, the defendant is not liable for operating and construction losses as contended by plaintiff.

The costs of appeal are adjudged against appellee and the cause remanded for any necessary proceedings for the enforcement of the judgment of this Court.

Done at Jackson in the two hundred and ninth year of our Independence and in the one hundred and eighty-ninth year of our Statehood.

CRAWFORD and HIGHERS, JJ., concur.