CUMBERLAND & OHIO CO. OF TEXAS, INC., the Successor Corporation of Herbert Materials, Inc., Plaintiff–Appellee,

v.

FIRST AMERICAN NATIONAL BANK, Defendant–Appellant.

No. 90–5295.

United States Court of Appeals, Sixth Circuit.

Submitted May 9, 1991.

Decided June 12, 1991.

Rehearing and Rehearing En Banc Denied Aug. 14, 1991.

Nader Baydoun (argued), John I. Harris, III, Harris & Baydoun, Nashville, Tenn., for plaintiff-appellee.

Robert J. Walker (argued), Robert E. Cooper, Jr., Anthony J. McFarland, Bass, Berry & Sims, Nashville, Tenn., for defendant-appellant.

Before KENNEDY and MARTIN, Circuit Judges, and ENGEL, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

First American National Bank ("the Bank") appeals a jury verdict rendered against it in this contract action. The plaintiff-appellee is Cumberland & Ohio Co. of Texas, ("the Company") which was known as Herbert Materials, Inc. at the time it contracted with the Bank. The Company's complaint raised claims based upon fraudulent and negligent misrepresentation, breach of contract, and breach of fiduciary duty under Tennessee law. The case was tried before a jury in September 1989, and a $6 million judgment was entered in favor of the Company. We now reverse the judgment, concluding that the statute of limitations had run on all of the Company's claims. In addition, we find that the Company had executed a valid waiver and release in favor of the Bank, precluding the Company's suit even had the action been timely filed.

The Company, which was based in Nashville, manufactured and sold bricks and building materials. In 1981, the Company established a $2.5 million working capital loan or line of credit with the Bank. Such loans are generally extended to borrowers who lack liquid assets, and they are usually made in the form of demand notes secured by the borrower's inventory and accounts receivable. At the time, the Company's overall debt exceeded $10 million, and the Bank asked for and received significant power to control the future business plans of the Company, apparently in order to ensure that the Company would survive and continue to meet its financial obligations to the Bank.

Among the changes the Bank sought in the Company's operation was the disposition of some of the Company's unprofitable divisions. The Company contends that it planned to sell off some of its assets, but not as quickly as the Bank wanted. Lending contracts signed by the Bank and the Company in July and August of 1981 gave the Bank the right to demand immediate and full payment of the $2.5 million loan and all other loans between the parties if the Company missed a payment or if the "Bank reasonably deem[ed] itself to be insecure" regarding the Company's ability to repay the loans. The documents also state that "All amounts advanced to Borrower are payable ON DEMAND." Any right of the Company to notice before the Bank demanded payment was "expressly waived." There was also a provision indicating that "in the absence of default, no demand for full payment of the Accounts Receivable and Inventory Loans will be made on or before thirteen months from the date of the Master Loan Agreement."

In late September 1982, after the 13–month period had run, the Bank sent a letter to the Company expressing its view that the Company was in default as defined in the loan agreement, and that the entire amount was then due. The Bank was not satisfied that the Company had reduced its inventory and assets to the extent required under the parties' loan agreement. The Bank also concluded that the Company had failed to secure sufficient additional capital for ongoing operations.

The Company disputed the Bank's allegations of default. Further negotiations between the parties resulted in a resumption of the line of credit to the Company in October 1982, provided the Company would obtain additional capital by the end of the year and would continue to sell some of its property and affiliates.

The Company indicated in early 1983 that it was considering legal action against the Bank for the Bank's 1982 demand for full payment. The Company believed the Bank was letting it "bleed to death" by limiting its access to additional working capital, and by holding liens on the Company's collat-

eral, whereas the Bank thought its actions were justified to ensure that the loans remained sufficiently collateralized and that the Company survive.

In January 1983, the Company asked that the collateral be released so that the working capital loan could be removed to another bank. Further discussions between the Company and the Bank led to the Bank's agreement to make a further loan to the Company in exchange for the Company's agreement to sell more property and to assign some notes payable to the Bank. In addition, the Bank sought a "waiver and release" from the Company which would release the Bank from any liability which the Company claimed the Bank owed for "breaching" the working capital loan agreement in 1982 by demanding immediate full payment of the loan. After several more months of discussions within the Company's board of directors and with the Bank, the Waiver and Release was signed by the Company and its shareholders in July 1983. It absolved the Bank from any liability whatsoever arising out of transactions made before that date. A similar release in favor of the Company was signed by the Bank at the same time. After the releases were signed, the Company transferred its line of credit to another bank, paid off the loans owed to the Bank, and terminated its relationship with the Bank in 1983.

In August 1988, the Company filed suit against the Bank in Tennessee Chancery Court, and the action was removed to federal court in September 1988. The Company claimed that it suffered losses of between $5 million and $7 million because the Bank's "financial pressures and arbitrary deadlines" forced the Company to sell off valuable assets at deep discounts. The Company alleged that it signed the Waiver and Release under economic duress because purchasers of the Company's assets wanted the Bank's liens removed, and the Bank would only remove them after the Company signed the Waiver. The jury awarded the Company $6 million, and the Bank filed a timely notice of appeal.

## I.

■ This court must review de novo the district court's determinations of state law. *Salve Regina College v. Russell,* — U.S. ——, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). The parties agree that Tennessee law applies to the contracts and actions at issue before us. The district court determined that a six-year statute of limitations period applied, so that the Company's suit, initiated five years after the alleged breaches of contractual and fiduciary duties, was timely. We disagree.

■ Tennessee's statute of limitations period is three years for injuries to personal or real property. Tenn.Code Ann. (T.C.A.) § 28–3–105. The six-year limitations period applies to "actions on contracts not otherwise expressly provided for" in the Tennessee code. T.C.A. § 28–3–109. The three-year limitations period applies when a defendant has allegedly breached his contract, causing injury to the personal or real property of the plaintiff. *See Pera v. Kroger Co.,* 674 S.W.2d 715, 719–20 (Tenn.1984).

■ The distinctions between Tennessee's three- and six-year limitations periods are illustrated in *Vance v. Schulder,* 547 S.W.2d 927 (Tenn.1977) and *Harvest Corp. v. Ernst & Whinney,* 610 S.W.2d 727 (Tenn.App.1980). We observe initially that decisions of a state's highest court, where applicable, must control over any conflicting opinions of an intermediate state appellate court. We need not rely wholly upon this principle here for, in all events, we find that the facts of the case before us are closer to those of *Vance* than to those of *Harvest Corp.,* and compel our conclusion that the three-year limitations period applied in *Vance* must apply here as well.

The district court relied upon *Harvest Corp.,* which applied the six-year limitations period to a contract action alleging economic injury. In *Harvest Corp.,* the plaintiff corporation sought damages from its accountants, alleging that the defendants' negligence had caused the corporation to overpay when it acquired another company's inventory. The *Harvest* court

determined that the plaintiff corporation, which was the *buyer* of property, did not suffer an injury to its personal or real property because at the time the accountants estimated the value of the company to be acquired, the plaintiff corporation did not own the property at issue. "The defendants' alleged breach of contract occurred through their misstatement of said property's value." *Harvest Corp.*, 610 S.W.2d at 730. This allegedly negligent misstatement did not affect the value of property then owned by the plaintiff corporation, so the corporation suffered money damages but not injury to its property.

In *Vance*, however, the Tennessee Supreme Court applied the shorter limitations period to an action in which the plaintiff alleged that the defendants' fraudulent misrepresentations had induced him to *sell* his stock for less than its value. The defendants were corporate directors who understated to a shareholder the value of an outsider's purchase price for the company's assets. The shareholder sold his stock, receiving in return roughly half the money actually paid by the buyer for the shares. The defendant directors allegedly kept the rest of the buyer's payment for themselves. The court concluded that T.C.A. § 28–3–105's three-year limitations period should apply. "We reject the notion that injury to property as contemplated therein is limited to physical injury to property. In our opinion, the loss in value sustained by plaintiff from the alleged tort of fraud and deceit is included within the phrase, 'injuries to personal property'[.]" *Vance*, 547 S.W.2d at 932.

In our case, the Company alleges that its property has been injured economically, in much the same way that the *Vance* plaintiff was injured by selling his stock. All damages claimed by the Company were incurred when it was allegedly forced by the Bank to quickly dispose of unprofitable assets, and was unable to complete the sell-off in a careful and economically beneficial manner. While the intrinsic value of the property sold by the plaintiff in *Vance* and the property sold by the Company in this case may have been unchanged by the actions of the defendants in the two suits, the lost value of the *Vance* plaintiff's stock at the time he sold it was found to be an injury to his property. The same may be said of the allegedly depressed market price obtained by the Company for its assets sold in the early 1980s. In both *Vance* and our own case, a seller contended that he did not receive as much for his stock or assets as he would have absent the defendants' alleged wrongdoing. In Tennessee, actions for injuries to personal or real property must be brought within three years after the alleged damages. The Company's action filed nearly six years after the Bank's demand for payment and allegedly improper demand for a disposition of some Company assets was time barred.

■ In Tennessee, "the gravamen of an action, rather than its designation as an action for tort or contract, determines the applicable statute of limitations." *Pera v. Kroger Co.*, 674 S.W.2d 715, 719 (Tenn. 1984). In *United States Textiles, Inc. v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1272 (7th Cir.1990), the court applied Tennessee's three-year statute of limitations, noting that the "difference between the action brought in *Vance* and that which is presented for our review today is that UST has alleged 'economic duress' rather than 'deceit.' This, however, is a distinction without meaning in the specific context of determining the appropriate limitations period under Tennessee law." In our case, the gravamen of the action was an alleged economic injury to the Company when property was sold at a loss. We agree with the Seventh Circuit that Tennessee's highest court would impose a three-year limitations period on such economic duress claims where the plaintiff seeks damages for alleged injuries to its property.

## II.

■ While we conclude that the statute of limitations defense is complete, and compels reversal as a matter of law, we find a co-equal reason for reversal in our conclusion that the Waiver and Release signed by the Company in July 1983 barred any legal action brought by the Company for alleged

liability arising before that date. There seems to be little dispute that the Company's waiver of any right to sue the Bank was supported by consideration, since the Bank signed a similar waiver in favor of the Company, and the Bank extended additional credit to the Company as part of the 1983 negotiations between the parties.

However, the Company contended at trial that it signed the Waiver and Release under economic duress, and therefore should not be bound by its terms. Economic duress has been defined as "imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another[.]" *Crocker v. Schneider*, 683 S.W.2d 335, 338 (Tenn.App. 1984) (citation omitted). The alleged coercive event must be of such severity, either threatened, impending or actually inflicted, so as to overcome the mind and will of a person of ordinary firmness. *Fogg v. Union Bank*, 63 Tenn. [4 Baxter] 530, 535 (1874). While we question the jury's finding that the Company signed the waiver under duress, given the length of time over which the Company's directors and legal counsel considered the issue, we conclude that in any event the Company's failure to repudiate the Waiver and Release until five years after its relationship with the Bank ended now bars any attempt by the Company to avoid the terms of the Waiver as a matter of law.

A contract signed under economic duress is voidable by the victim, not void. Restatement (Second) of Contracts §§ 175 & comment d, 176 & comment a (1981). *See In re McNeil*, 22 B.R. 408, 414 (Bkrtcy. E.D.Tenn.1982) ("A contract or other instrument is voidable under Tennessee law on the basis of duress ...."); *Blair v. Coffman and Blackburn*, 2 Tenn. [2 Overt.] 176, 177 (1812) ("The matter of fact which would invalidate voidable acts must always be pleaded; hence the necessity of this course as to duress."). This is distinguished from duress by physical compulsion, which renders a contract void. No allegations of physical duress have been raised by the Company.

In general, a party seeking to avoid a contract induced by economic duress must act promptly upon removal of the duress to avoid the contract. *DiRose v. PK Management Corp.*, 691 F.2d 628, 633–34 (2d Cir.1982). In Tennessee, a party who chose to perform under a written agreement for nearly two years was found to have ratified it, and was estopped from claiming economic duress to avoid the agreement's terms. *Crocker v. Schneider*, 683 S.W.2d 335 (Tenn.App.1984). Generally, where the contract is a Waiver and Release, the releasor who retains the consideration after learning that the agreement is voidable has effectively ratified the release and may not later avoid its terms. *Grillet v. Sears, Roebuck & Co.*, 927 F.2d 217, 220 (5th Cir.1991).

In this case, the Waiver and Release was signed by the Company in 1983. Not until the law suit was filed in 1988 did the Company repudiate the waiver and raise the duress argument. The lending relationship between the Bank and the Company had ended five years earlier. No letter or other document from the Company during those five intervening years suggested that it felt it had been subjected to duress. As noted above, a party who for twenty-two months after the alleged economic duress chose to abide by the terms of his agreement and retain the consideration was thereby estopped from claiming duress under Tennessee law. *Crocker*, 683 S.W.2d at 340. In our case, the Company's five-year failure to take any affirmative steps to repudiate the allegedly voidable contract bars its present argument that the waiver was not effective when the Company finally brought suit against the Bank in 1988.

III.

We conclude that the Company's suit was barred by the applicable Tennessee statute of limitations, as well as by the Waiver and Release which even if voidable, was not timely repudiated. As a result, we need not consider the Bank's further arguments that the Company breached the terms of the loan agreement, or that the

district court improperly instructed the jury at trial.  The judgment of the district court is REVERSED, and the case remanded for entry of judgment in favor of First American National Bank.