# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
June 4, 2013 Session

## BRENDA BENZ-ELLIOTT v. BARRETT ENTERPRISES, LP ET AL.

**Appeal from the Chancery Court for Rutherford County**
**No. 081355CV    John D. Wootten, Jr., Judge**

---

**No. M2013-00270-COA-R3-CV - Filed July 29, 2013**

---

In this dispute concerning a real estate sale contract, we have concluded that the gravamen of the action is for injury to property and that, under the applicable legal principles, the evidence preponderates against the trial court's finding as to when the statute of limitations began to run. Because the action is barred by the statute of limitations, we reverse the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., and RICHARD H. DINKINS, JJ., joined.

Peter V. Hall, Murfreesboro, Tennessee, for the appellant, Barrett Enterprises, LP, et al.

G. Sumner R. Bouldin, Jr., Murfreesboro, Tennessee, for the appellee, Brenda Benz-Elliott

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Brenda Benz-Elliott ("Ms. Elliott") owned approximately 91 acres of property between I-24 and Manchester Pike in Rutherford County. Barrett Enterprises, LP ("BE"), owned a four-acre tract of property adjacent to Ms. Elliott's property; BE's property is located on Miller Lane, a frontage road running along I-24. Ronnie Barrett ("Mr. Barrett") is the general partner of BE and operates a firearms manufacturing business located on BE's property.

Ms. Elliott and Mr. Barrett had known each other for approximately 25 years. In 2004, Mr. Barrett approached Ms. Elliott and her husband about purchasing approximately

five acres of her property in order to allow Mr. Barrett to expand his firearms manufacturing business. Although Ms. Elliott was initially reluctant to sell, Mr. Barrett told her to "name your price," and she decided to sell a little over five acres for $82,500.00 per acre.

On August 5, 2004, Ms. Elliott and BE entered into a contract for sale of real estate. The contract includes the following condition:

> Seller to reserve ownership of a sixty feet (60') wide strip along I-24 for extension of Miller Road to connect remaining Seller's property. Buyer agrees to extend Miller Road built to county specifications along I-24 to a point ten (10) feet south of his new south property line.

Under the contract, Ms. Elliott was obligated to pay for the cost of a survey and deed preparation; however, because she did not know any land surveyors, Ms. Elliott agreed for Mr. Barrett to arrange for a survey. By this point, Ms. Elliott and Mr. Barrett had renewed their friendship and frequently socialized together.

Before the contract was signed, Mr. Barrett contacted the Tennessee Department of Transportation ("TDOT") concerning a proposal to move the fence bordering I-24 in order to allow a straight-line extension of Miller Lane. It is undisputed that this arrangement would have been more beneficial to both parties than the extension plan contemplated in the condition in the real estate sale contract. After the contract was signed, the parties continued to work with TDOT to try to work out an acceptable plan. Mr. Barrett and Mr. Elliott met with state officials in December 2004 to discuss moving the fence to allow for the extension of Miller Lane. In February 2005, Mr. Elliott sent TDOT a letter stating that the parties had met with various county and state officials concerning the project and requesting TDOT authorization of the proposed moving of the fence.

Paul Degges, TDOT's chief engineer, responded with the following letter:

> Thank you for your letter concerning our recent meeting to discuss the possible relocation of the right of way fence along I-24 and the Miller Lane frontage road in Rutherford County. I was glad to read of the support that you have garnered for the expansion of Barrett Arms [the firearms manufacturing company] and the extension of Miller Lane.
>
> As we discussed, the Tennessee Department of Transportation is in support of this economic development for the local area, although this is contingent on the department agreeing to relocate our fence in order to accommodate the extension of the county right of way for Miller Lane, the existing frontage

road.

> When formal plans are available, we will allow the relocation of the fence to a point to be determined by this department. Also, as you stated, this agreement in no way binds the department to any financial responsibility as regards to the future project.

> We look forward to working with all parties as this project becomes more fully developed.

Based upon this letter, Mr. Barrett began obtaining permits and working with attorney Jeff Reed to prepare for the closing of the property sale.

The sale closed on March 25, 2005. At closing, several provisions of the sale contract were modified in writing, but there was no written modification of the provision requiring the reservation of a 60-foot strip by Ms. Elliott. The deed description did not provide for the reservation of a 60-foot strip by Ms. Elliott.

Over the next two years, Mr. Barrett continued to make efforts to finalize the desired straight-line extension proposal with TDOT and other governmental entities. Construction of the plant expansion began in late 2005 or early 2006. In June 2006, TDOT sent Mr. Barrett a letter with a plan "that meets both your need to accommodate truck traffic to your new facility and our need to preserve the integrity of the interstate right of way." The proposed extension was not, however, the straight-line extension desired by the parties; rather, the TDOT plan showed what the parties have referred to as a "dog-leg" extension (including a curve) of Miller Lane. Under this plan, only a short portion of TDOT's fence would have to be relocated. The TDOT plan would have put part of the road extension in the same location as detention ponds already constructed by BE next to its new building. Mr. Barrett was not willing to go forward with TDOT's plan.

In late November or December 2007, Ms. Elliott decided to contact attorney Thomas Haynes, the same attorney who had advised her in drafting the real estate sale contract, regarding her concerns that the road to access her property had not yet been built. Mr. Haynes reviewed the warranty deed to the property and advised Ms. Elliott that it did not allow for her reservation of a 60-foot strip as stated in the contract.

On September 22, 2008, Ms. Elliott filed suit against BE and Mr. Barrett for breach of contract, negligent misrepresentation, and fraud. Ms. Elliott prayed for specific performance and damages.

The case was tried, without a jury, in October and November 2010. Ms. Elliott was the first witness to testify. She stated that, prior to the filing of this lawsuit, she never saw the survey of the property she sold to BE. According to Ms. Elliott, at the closing of the sale in March 2005, there was no discussion about dispensing with the contract requirement of the reservation of a 60-foot strip for her. After the closing, there were "a number of discussions about different scenarios, different routes" for the extension of Miller Lane. She further stated that she never indicated in writing or otherwise that she would no longer want to reserve the 60-foot strip if Miller Lane could be extended straight down the right-of-way. At the time of the hearing, Miller Lane had not been extended to allow access to Ms. Elliott's remaining property. Ms. Elliott testified that she and her husband tried to help Mr. Barrett get the fence along the right-of-way moved to allow for the extension of Miller Lane, and that such an extension would have helped her property: "Because a straight-line extension that keeps popping up would have been mutually beneficial to both of us [Ms. Elliott and Mr. Barrett], and it would have enhanced my property and made it worth more."

The next witness was Tom Haynes, the attorney who advised Ms. Elliott in the drafting of the original sale contract and who later met with her to discuss the delays in getting an extension of Miller Lane. After viewing an original draft of the sale contract, Mr. Haynes advised Ms. Elliott to add a provision reserving ownership of a 60-foot-wide strip to ensure access to the remainder of her property.

Cecil "Bud" Elliott testified about his participation in the attempts to get approval for a straight-line extension of Miller Lane.

Russell Parrish, a licensed real estate appraiser, testified on behalf of the plaintiff concerning the appraisal he performed on the property in August 2009. He was asked to determine the diminution in the value of Ms. Elliott's remaining property as a result of Mr. Barrett's failure to extend the road to allow access to her property. Mr. Parrish calculated the 86 acres to be worth $5,332,000 before the sale, and $3,956,000 in March 2009; these figures reflect a diminution in value of $1,376,000, or 25.8%, due to the loss of access to the property.

Roger Morse, an engineer, testified that his firm was hired by Mr. Barrett to perform survey work on the property that was to be sold by Ms. Elliott to BE. Mr. Morse testified about a meeting with Mr. Barrett and Mr. Elliott about the property at issue and a rough sketch done by Mr. Elliott. Mr. Morse never had any contact with Ms. Elliott concerning the project.

Paul Degges, a civil engineer employed by TDOT, testified about the negotiations with Mr. Barrett and the Elliotts concerning the possibility of moving the right-of-way fence to allow the extension of Miller Lane. Dr. Degges testified that, at an initial meeting in January 2005 with Mr. Barrett and Mr. Elliott, he explained that "I didn't feel that we could allow the extension of the road on the interstate right-of-way, but I did feel there would be an opportunity for us to help partner with Rutherford County." He further explained that TDOT "could work with the County and build a public road, provide that access adjacent to the interstate." Mr. Degges also provided the following testimony concerning the options discussed at the initial meeting:

> Q. At this initial meeting with Mr. Elliott and Mr. Barrett, was there also discussed an alternative proposal whereby just a little corner of the right-of-way fence would be removed?
> A. Yes. In the discussion we talked about offsetting the road so it wouldn't be on I-24 right-of-way-proper. And Mr. Barrett and Mr. Elliot were concerned about getting 18-wheeler traffic in through here. So we kind of sketched out and, kind of, talked about, to be able to make that turn, that as transportation engineers we would be able to design a road to be able to make those types of turns; and, if necessary, I felt that I might be able to cut a corner off of the fence if I had to. But I just—we just didn't feel that we could build the road down the right-of-way. So the discussion of moving the fence had to do with the cutting the corner off of the fence.

TDOT sent a letter and drawing to Mr. Barrett and Mr. Elliott describing the general concept that the department was willing to approve. Mr. Barrett consistently returned to the straight-line extension down the right-of-way, and Mr. Degges consistently responded that this was not going to be possible. He testified that TDOT never agreed to the straight-line extension plan.

The first witness for the defendants was Wilburn Honeycutt, consulting engineer, who provided design services on the construction of the manufacturing facility on BE's new property. He testified that TDOT's proposal for extending Miller Lane was not workable because the suggested changes to the detention pond would not, in his opinion, allow for the necessary drainage.

Jeff Reed, the attorney who handled the closing of the real estate sale, testified that he asked Mr. Barrett prior to closing what the parties' intent was with respect to the 60-foot strip. Mr. Barrett told Mr. Reed that the parties had been working with TDOT with regard to moving the right-of-way and that TDOT had agreed to their plan. Mr. Reed recalled presenting the deed to the parties at closing and receiving assurances that they had an

arrangement with TDOT to move the right-of-way.

Johnny Sullivan, a real estate appraiser, testified on behalf of the defendants. His estimate of the value of Ms. Elliott's remaining 86 acres of property as of March 2005 was $1,404,000. His estimate of the diminution in value caused by the lack of access was $99,000. Thus, the final value of the property was $1,305,000.

Mr. Barrett was the next witness, and he testified that the parties did not close on the real property sale "until we had assurances and an agreement from TDOT that that [the desired extension of Miller Lane] was going to occur." He stated that he would not have proceeded with the sale with the reservation of the 60-foot strip as the means of establishing access. Mr. Barrett testified that, in signing the contract and proceeding with the new building, he relied upon Ms. Elliott's silence concerning the 60-foot strip and her lack of objections at closing.

*Decision of trial court*

After hearing all of the proof, the trial court dismissed Ms. Elliott's causes of action for intentional and negligent misrepresentation, but found that she had carried her burden of proof on the breach of contract claim. In reaching these conclusions, the trial court took note of the course of dealings between the parties and their friendship; the court also discussed the fact that attorney Haynes suggested the insertion of the 60-foot condition in order to prevent Ms. Elliott's remaining property from being landlocked on the interstate side. The court went on to make the following relevant findings of fact:

> This contract was signed in August of 2004, closing was not until March of 2005. There was some testimony about conversations with TDOT. And this Court has seen multiple exhibits of e-mails, recollections of conversations, all having to do with maybe how the road ought to be configured . . . .
>
> Now, come March of 2005, what I see is a closing, a presentation of a deed, based upon the metes and bounds description, but there was no survey there. And indeed I note particularly that Mr. Reed said that he presented the deed . . . , but he didn't go over that [the metes and bounds] in particular. . . .
>
> Now, let's go to the next cause of action, under the breach of contract theory. Has the Plaintiff carried her burden of proof with regard to a breach of contract? I said earlier, to me, the gist of this contract, first just to sell the property but also there's specific therein a reservation of ownership of 60 feet. The contract also says that anything having to do with an alteration or

-6-

modification has to be in writing. One thing [written modification] was done—it had to do with taxes, but one thing was done. The rest of this has to do with contract—or conversations about the best results that this road might be configured after the contract was signed or even after the closing; and it was all dependent upon third parties, particularly the State of Tennessee. . . . The key document in this case is the contract. As I said earlier, I think it's clear.

Now, is there a breach of contract? Well, there is no road. No road has been built. Number two, there is no reservation of 60 feet. So, yes, there is a breach of contract. I find specifically that the Plaintiff has carried her burden of proof in that regard.

Because the defendants had already constructed an expensive manufacturing facility and there was a detention pond where the extension of Miller Lane would have to be constructed, the trial court concluded that specific performance was not possible. The court awarded Ms. Elliott $850,000 in damages. The court subsequently entered an order awarding her discretionary costs. In response to a motion to alter or amend filed by the defendants, the trial court entered an amended final judgment on March 3, 2011.

*Prior appeal*

The defendants appealed the trial court's March 2011 order. While that appeal was pending, the defendants filed a motion to consider post-judgment facts asserting that Ms. Elliott had received access to her property from Miller Lane, thereby rendering her case moot. On June 6, 2012, this court granted the defendants' motion and remanded the case to the trial court for further findings in light of the post-judgment facts.

*Decision on remand*

On remand, another hearing was held on November 1, 2012. The maps introduced into evidence show that the relocated Miller Lane goes behind BE's property and extends to the southwest corner of Ms. Elliott's property, where it ends in a cul-de-sac. The access road is not adjacent to I-24; rather, it abuts part of Ms. Elliott's property close to her house and outbuildings.

Mr. Parrish testified as to his revised opinion as to the diminution in value of Ms. Elliott's property in light of the new access road. His revised figure for the total diminution in value was $1,066,496. This figure reflects the diminution in value due to the lack of ingress and egress along I-24. The defendants called their appraiser, Mr. Sullivan, back to

the stand. He opined that, in light of the new access road, there was no diminution in value to Ms. Elliott's property.

The court entered an order on November 29, 2012 reducing the amount of the judgment to $650,000.

ISSUES ON APPEAL

The defendants argue in this appeal that: (1) the plaintiff's claim was barred by the statute of limitations; (2) the plaintiff's breach of contract claim must fail under principles of waiver or estoppel; (3) the plaintiff was guilty of laches; (4) the trial court erred in holding by implication that the plaintiff's husband was not her agent; (5) the trial court erred in entering an award of damages; and (6) the trial court erred in its award of discretionary costs.

ANALYSIS

(1)

We begin with the issue of the appropriate statute of limitations, which is a question of law and, therefore, subject to de novo review. *See Bldg. Materials Corp. v. Britt*, 211 S.W.3d 706, 711 (Tenn. 2007). The defendants argue that the statute of limitations for injury to property, found at Tenn. Code Ann. § 28-3-105(1), is applicable here and bars the plaintiff's action. The plaintiff asserts that the statute of limitations for a breach of contract, found at Tenn. Code Ann. § 28-3-109(a)(3), governs here and that, even under the statute of limitations for injury to property, the statute did not begin to run until December 2007.

The gravamen of an action, not whether it is brought in the form of an action in tort or an action for breach of contract, will determine the appropriate statute of limitations. *Pera v. Kroger Co.*, 674 S.W.2d 715, 719 (Tenn. 1984); *Mid-South Indus., Inc. v. Martin Mach. & Tool, Inc.*, 342 S.W.3d 19, 29 (Tenn. Ct. App. 2010). To determine the gravamen, "or real purpose of an action, the court must look to the basis for which damages are sought." *Mid-South Indus.*, 342 S.W.3d at 29 (quoting *Keller v. Colgems-EMI Music, Inc.*, 924 S.W.2d 357, 359 (Tenn. Ct. App. 1996)); *see also Mike v. Po Grp., Inc.*, 937 S.W.2d 790, 793 (Tenn. 1996).

Our Supreme Court has stated that a decrease in the value of property (or the plaintiff's interest therein) constitutes an injury to property under Tenn. Code Ann. § 28-3-105(1). *See Alexander v. Third Nat'l Bank*, 915 S.W.2d 797, 799-800 (Tenn. 1996); *Vance v. Schulder*, 547 S.W.2d 927, 932 (Tenn. 1977). Determining whether damages are sought for injury to property can be a close question in some cases. *See Mid-South Indus.*, 342

S.W.3d at 30-31. In this case, however, we conclude that Ms. Elliott seeks damages for the decreased value of her remaining property due to the defendants' failure to provide access to her property as contemplated in the contract. Thus, the gravamen of her complaint is damage to real property.[1] *See also Cumberland & Ohio Co. of Texas, Inc. v. First Am. Nat'l Bank*, 936 F.2d 846, 849 (6th Cir. 1991).

In arguing for application of the six-year statute of limitations for breach of contract, the plaintiff cites *Alexander v. Third Nat'l Bank*, 915 S.W.2d at 799. In that case, our Supreme Court reversed the decision of this court and held that the action was governed by the statute of limitations for breach of contract. *Id.* at 797. The plaintiffs in *Alexander*, purchasers of an apartment complex, sued the bank for loaning only $350,000 of an agreed amount of $600,000. *Id.* at 797-98. The plaintiffs' complaint alleged causes of action sounding in contract and tort; the damages sought were for the additional costs of renovation caused by the financing delay, increased interest rates, lost rent, and loss of equity due to the inability to find substitute financing. *Id.* at 798. The Court determined that there had been "no injury to the property, but rather interference with the plaintiff's anticipated economic gain from the use of the loan proceeds." *Id.* at 799. The Court went on to state:

> [N]either the value of the property nor the plaintiff's interest in the property was diminished by the failure to loan the money; those values were not affected by the alleged breach of contract. Consequently, there was no damage to property or to an interest in property.

*Id.*

We find *Alexander* to be distinguishable from the present case. In our case, unlike in *Alexander*, the plaintiff seeks damages for the loss in value of her property caused by the defendants' breach. Such loss in value constitutes injury to property and is, therefore, governed by the three-year statute of limitations of Tenn. Code Ann. § 28-3-105(1).

Having determined the applicable statute of limitations, we must proceed to the question of when the three-year statute began to run. In denying a motion to dismiss under the statute of limitations, the trial court concluded that, even if the three-year statute of limitations governed, it did not begin to run until December 2007, which is when Ms. Elliott contacted her attorney and learned that the deed did not reserve her 60-foot strip of land. The defendants argue that, with the exercise of reasonable care and diligence, Ms. Elliott should have discovered the injury at the closing in March 2005.

---

[1]The trial court declined to award specific performance in this case, and that decision is not challenged on appeal. Therefore, we need not address the statute of limitations applicable to that claim.

The discovery rule determines when the statute of limitations begins to run: when the plaintiff knew or should have known that he had suffered an injury as a result of the defendant's wrongful conduct. *John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn. 1998); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Thus, even without actual notice, a plaintiff is "deemed to have discovered the right of action if he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct." *Carvell*, 900 S.W.2d at 29 (quoting *Roe v. Jefferson*, 875 S.W.2d 653, 657 (Tenn. 1994)). The determination of whether a reasonable person would have known that he or she had been injured by a wrongful act is generally a question of fact. *Sherrill v. Souder*, 325 S.W.3d 584, 596-97 (Tenn. 2010); *McIntosh v. Blanton*, 164 S.W.3d 584, 586 (Tenn. Ct. App. 2004).

In determining that the statute did not begin to run until December 2007, the trial court implicitly found that Ms. Elliott's failure to discover the injury earlier was reasonable. On appeal, Ms. Elliott makes the following argument regarding whether she should have known of the omission of the 60-foot strip in the deed at the closing:

> Mrs. Elliott did not obtain the surveyor, the engineer, or the closing attorney. She had known Mr. Barrett for some twenty-five years, and she relied upon him to do what he had agreed to do both orally and in writing. Barrett solely communicated with these professionals, who collectively contributed to the omission of the sixty-foot strip. At the closing, there was no written modification of the contract, no discussion of the sixty (60) foot strip, no interlineations made in the contract regarding the sixty (60) foot strip, and no survey to visually show its omission. Mrs. Elliott had no reason to suspect that Barrett would cause such a breach.

The crux of Ms. Elliott's position is that, because of her friendship with Mr. Barrett, she acted reasonably in assuming that the deed complied with the real estate sale contract and in failing to obtain a copy of the survey or examine the deed at closing. We cannot agree with this line of reasoning.

Although the trial court's determination of the reasonableness of Ms. Elliott's failure to discover the breach until December 2007 constitutes a finding of fact, the evidence preponderates against this finding under the relevant legal principles. Ms. Elliott cites no authority, and we know of none, supporting the proposition that a friendship should relieve one of the obligation to read and examine the documents at a real estate closing. *See generally Solomon v. First Am. Nat'l Bank*, 774 S.W.2d 935, 943 (Tenn. Ct. App. 1989).

Ms. Elliott briefly argues that the facts support a finding that the defendants

fraudulently concealed her cause of action. Fraudulent concealment prevents the statute of limitations from beginning to run until the discovery of the fraud. *Nobes v. Earhart*, 769 S.W.2d 868, 873 (Tenn. Ct. App. 1988). To establish fraudulent concealment, the plaintiff must prove: "(1) that the defendant took affirmative action to conceal the cause of action or remained silent and failed to disclose material facts despite a duty to do so and, (2) the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence." *Shadrick v. Coker*, 963 S.W.2d 726, 735 (Tenn. 1998). In this case, there is no evidence of affirmative action on the part of the defendants to conceal the cause of action. Thus, to make a case for fraudulent concealment, the plaintiff would have to establish that the defendants "remained silent and failed to disclose material facts despite a duty to do so." *Id.*

In the context of fraudulent concealment, the existence of a confidential or fiduciary relationship creates a duty to disclose. *Id.* Examples of such confidential relationships include husband and wife, physician and patient, attorney and client. *Id.*; *Nobes*, 769 S.W.2d at 873. In the present case, there is no confidential or fiduciary relationship that would entitle Ms. Elliott to place her trust in the defendants.

Under the applicable legal principles, the evidence preponderates against the trial court's finding that Ms. Elliott acted reasonably in failing to discover the injury before March 2007. We must conclude, therefore, that the plaintiff's action is barred by the statute of limitations.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed. Costs of appeal are assessed against the appellee, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE