NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1135n.06

Nos. 10-6530/11-5055

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Nov 05, 2012*

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| NEURO-SPINE SOLUTIONS, PC, | ) | |
| MORGAN P. LORIO, MD, | ) | |
|  | ) | |
| Plaintiffs - Appellants | ) | |
| Cross - Appellees, | ) | |
|  | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE EASTERN |
| VICTOR T. FREUND, MD | ) | DISTRICT OF TENNESSEE |
|  | ) | |
| Defendant - Appellee | ) | |
| Cross - Appellant. | ) | |

Before:  COLE and DONALD, Circuit Judges; and SARGUS, District Judge.[*]

**SARGUS, District Judge.**  This appeal involves a financial dispute arising after two doctors,

one an orthopedic surgeon and the other a neurosurgeon, initially formed shared practices, which

eventually ended when the appellee-cross appellant, Dr. Victor T. Freund, withdrew.  The appellant

Dr. Morgan P. Lorio is the majority shareholder in the corporation formed as to the combined

practices, Neuro-Spine Solutions, PC ("Neuro-Spine"), a Tennessee professional corporation. Each

doctor makes claims against the other for breaches of the Shareholder's Agreement and the Physician

Employment Agreement that governed their relationship.  In addition, Neuro-Spine brings claims

against Dr. Freund for loans allegedly made to TK&L, P.C. ("TK&L"), a corporation in which he

owns all of the stock.  Relevant to this appeal, the district court granted Dr. Freund summary

_____

[*]The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District
of Ohio, sitting by designation.

judgment as to the appellants' claim that Freund was personally obligated to pay a percentage of a line of credit originally secured by Neuro-Spine. Following a bench trial, the district court issued Findings of Fact and Conclusions of Law, concluding that Dr. Freund had not breached his employment agreement and was not liable for repayment of monies paid out to TK&L. The district court rejected Dr. Freund's claim for breach of contract against Dr. Lorio and concluded that he was owed nothing for his stock in Neuro-Spine. Thereafter, Dr. Lorio moved to alter or amend the judgment, which the district court denied. For the reasons that follow, we **AFFIRM** the district court's decisions.

## I. BACKGROUND

### A. Dr. Lorio

The primary issue as to the claims of the appellant Dr. Lorio is whether, at the time of termination of Neuro-Spine, the withdrawing physician Dr. Freund was required to pay rather than receive, funds representing the value of the stock. In the appellant's view, Dr. Freund should have been required to reimburse Neuro-Spine, since the company had more debt than assets. Further, because Dr. Freund had allegedly been over-compensated, his overdraw should have been repaid at the time of his withdrawal. Specifically, Dr. Lorio contends that Dr. Freund breached the Shareholders' Agreement signed by both physicians and obligated Dr. Freund to pay him $531,416.59, which included amounts for excess compensation, repayment of two loans and payment of $196,440.00 on a $600,000 line of credit secured by the corporation.

In turn, Dr. Freund alleges that Dr. Lorio improperly withdrew $223,000 on the day that the assets of Neuro-Spine were to be measured, in an effort to devalue the stock held by Dr. Freund.

2

According to the Shareholders' Agreement, the stock of the withdrawing shareholder, Dr. Freund, was to be purchased by the remaining shareholder. The value of such purchased stock was to be computed according to a formula which included cash on hand.

The district court found that the Shareholders' Agreement and the Physician Employment Agreement only provided for payment to Dr. Freund in the event the stock had value, did not obligate him to repay any of the corporation's debts and did not require him to repay any excess salary. As to Dr. Freund's counterclaims, the district court concluded that Freund had been overpaid to the detriment of Dr. Lorio, which negated any damages otherwise resulting from Lorio's withdrawal of funds from the corporation.

Thus, the issue before us turns on the interpretation of the two Agreements which were executed in tandem. As discussed, *infra*, the Physician Employment Agreement between Dr. Freund and Neuro-Spine sets forth the method of compensation for services performed by Dr. Freund. The Shareholders' Agreement executed between Neuro-Spine, Dr. Lorio and Dr. Freund sets forth the financial consequences resulting from the withdrawal of either Dr. Lorio or Dr. Freund. Paragraph 4.4 of the Shareholders' Agreement states in its entirety:

> 4.4 **Resignation, Employee Without Cause Termination or Expiration**. Upon the resignation of a Shareholder in his capacity as an officer, director, and employee or upon the termination of the Shareholder's Employment Agreement pursuant to an Employee Without Cause Termination or the expiration or non-renewal of a Shareholder's Employment Agreement for any reason whatsoever, the other Shareholder shall have the option of either (i) purchasing all of the Stock owned by the Terminating Shareholder, for the Termination Purchase Price and upon the terms and conditions set forth herein, or (ii) causing the Corporation to wind down and dissolve in accordance with Section 19 of this Agreement.

The parties do not dispute that Dr. Freund properly resigned without cause thereby triggering the operation of this paragraph. By its express terms, the Shareholders' Agreement gives the non-withdrawing shareholder, Dr. Lorio, the option to purchase the stock of the withdrawing partner or cause a dissolution of the corporation. Dr. Lorio elected to purchase the shares owned by Dr. Freund.

Paragraph 4.4 provides that, in the event of such purchase, the value of the stock owned by the withdrawing shareholder shall be determined by the formula set forth in the Shareholders' Agreement. The value is defined in Paragraph 2 as follows:

> "Termination Purchase Price" shall mean the monetary amount to be paid to the Terminating Shareholder which shall equal 100% of Value attributable to the Terminating Shareholder, net of the percent of the Liabilities of the Corporation which percent is equal to the Terminating Shareholder's Applicable Percent and net of any Specific Liabilities attributable to the Shareholder.

The term "Value" as used in this section is further defined in Paragraph 2 as:

> "Value" shall be defined as the sum total obtained by adding (i) all of the Collected Fee Interests of the Shareholder, (ii) the percent of the Corporation's cash on hand on the date of the applicable termination event equal to the Shareholder's Applicable Percent, and (iii) the percent of the Tangible Assets Value (as defined below) of the Corporation on the date of the applicable termination event equal to the Shareholder's Applicable Percent. "Tangible Assets Value" shall mean an amount of cash equal to the adjusted book value of the assets of the Corporation, determined in accordance with generally accepted accounting principles consistently applied with no value given to goodwill or other intangibles (calculated without including (a) any Collected Fee Interests, or (b) any Liabilities or Specific Liabilities).

The district court correctly summarized this section as meaning a thirty-five percent (35%) share of receivables collected over the period of January 31, 2007 through January 31, 2011; thirty-five percent (35%) of Neuro-Spine's cash on hand as of January 31, 2007; and thirty-five percent

4

(35%) of the tangible asset value of the corporation on January 31, 2007. No mention is made as

to a possibility in which the withdrawing stockholder would be required to pay Neuro-Spine.

Paragraph 5.1 states:

> **Manner of Payment.** The Termination Purchase Price, or the Involuntary Purchase
> Price, as applicable, shall be paid by the remaining Shareholder as follows:
>
>     (a)     monies to be received by the Terminating Shareholder pursuant to
> items (ii) and (iii) referenced in the definition of "Value" shall be first utilized to
> retire the percent of the Liabilities of the Corporation which percent is equal to the
> Terminating Shareholder's Applicable Percent (the "Terminating Shareholder's
> Liability Percentage") and the Specific Liabilities attributable to the Terminating
> Shareholder;
>
>     (b)     in the event that there is shortfall in retirement of the Specific
> Liabilities attributable to the Shareholder and the Terminating Shareholder's Liability
> Percentage pursuant to (a), then monies received by virtue of item (i) of the definition
> of Value shall be utilized to retire the remaining balance of such Specific Liabilities
> and the Terminating Shareholder's Liability Percentage;
>
>     (c)     in the event that there is a shortfall in payment of the Specific
> Liabilities attributable to the Shareholder and the Terminating Shareholder's Liability
> Percentage pursuant to (b) then the Terminating Shareholder shall be entitled to
> receive no monies hereunder pursuant to the Terminating Shareholder Closing and
> shall agree to execute all documents transferring his interests in the Stock to the other
> Shareholder(s) for no monetary consideration.

The parties stipulated that Dr. Freund gave notice on October 31, 2006 that he would be

withdrawing from employment as of January 31, 2007. Prior to October 31, 2006, Neuro-Spine

retained a C.P.A., C. Stanley Bowles, to review and evaluate the cash flow of the business. He

reviewed the income and salaries paid by the corporation and determined that Dr. Freund had been

overpaid. Consequently, before Dr. Freund completed his employment, he paid $42,000 back to

Neuro-Spine.

Dr. Freund's Physician Employment Agreement provided for a method of compensation set forth in Paragraph 8:

> 8. Compensation. During the term of Employee's employment pursuant to this Agreement, the Employer agrees to pay Employee, and Employee agrees to accept from Employer, in full payment of services rendered by Employee and work to be performed by Employee under the terms of this Agreement, a Salary and Bonus as follows:
>
> A. Salary. Employee shall receive a Salary during his employment in an amount equal to One Hundred Percent (100%) of Employee Net Revenues (as defined below). "Employee Net Revenues" shall be defined as amounts actually received by Employer as a result of professional services personally performed by Employee (but not including "Ancillary Revenues," as defined below), minus the sum of (a) the product obtained by multiplying (i) Employee's Pro Rata Expense Percentage Interest (as defined in the next sentence) by (ii) the total Practice Expenses (as defined in the next sentence), and (b) Specific Allocated Expenses (as defined below) attributable to Employee. . . .

Accountant Bowles originally opined that Dr. Freund owed Neuro-Spine $538,575.80. After the district court granted partial summary judgment in favor of Dr. Freund, Bowles subtracted three categories of amounts owed, consistent with the court's order, and determined a new amount of $335,075.90. This amount includes alleged excess compensation in the amount of $251,726.08, monies allegedly loaned to Neuro-Spine by TK&L in the amount of $83,174.82, and a shareholder's loan of $175.00.[1]

Dr. Lorio has raised two assignments of error which conflate the issues brought in this appeal. The disputed issues on appeal by the appellants are fairly summarized as follows: (1) Whether the district court erred in determining the value of the stock owned by Dr. Freund; (2)

---

[1]No issue related to this loan is raised on appeal.

Whether Dr. Freund was obligated to repay any excess compensation he received; (3) Whether Dr. Freund's personal, professional corporation was obligated to repay monies to Neuro-Spine; (4) Whether Dr. Freund was obligated to repay a prorated share of the line of credit obtained by Neuro-Spine. Each of the issues is addressed *seriatim.*

1.      Value of the Stock

The district court reviewed the specific language of the Shareholders' Agreement and determined that it "does not contemplate or allow a negative value." Paragraph 4.4 refers only to the "purchasing" of the stock or the Termination Purchase Price. Under the definition of the Termination Purchase Price, reference is made only to the value, with no mention of debt or of a possibility that money could be owed by the terminating shareholder. Finally, the definition of "value" only describes assets, not liabilities. The collective, specific language of the Shareholders' Agreement only provides for payment to a withdrawing shareholder, with no mention of repayments to the corporation.

2.      Obligation to Repay Excess Compensation

The district court concluded that "neither the Employment Agreement nor the Shareholders' Agreement specifically states that Freund is required to repay any excess compensation." The district court looked to the language at Paragraph 5.1(c), which applies if there is a negative balance owed to the terminating shareholder. Rather than requiring a repayment by the terminating shareholder, the Shareholders' Agreement provides that such terminating shareholder "receive no monies" in exchange for a sale of the stock. The agreement contains no provision for a repayment

7

of overdrawn compensation, in the event actual income was not in line with the pre-arranged payouts.

The parties agreed to use a fixed, historic salary compensation basis and discarded the contractual formula. The district court found that the two doctors did not follow the formula for all of 2005 and the first nine months of 2006. Not until August of 2006, did the accountant begin to work on calculations. Further, at no point were computations prepared to determine ancillary revenue amounts, payable as bonuses under the employment agreement. From this, the district court concluded that the parties had, by their conduct, agreed to a different form of compensation, based on historic, pre-agreement salaries, not in conformity with Paragraph 8 of the Employment Agreement.

The district court found that the parties simply disregarded the compensation provisions of the Employment Agreement and adopted a look-back, historical basis of pay, premised upon earnings from prior years. Even if this conclusion were erroneous, the court also noted that "no express provision of the contracts . . . require repayment of excess salary."[2]

3.     Repayment of Loan to Dr. Freund's Professional Corporation

In 2005, Neuro-Spine paid TK&L, a personal professional corporation owned by Dr. Freund, the sum of $143,4l4.34, of which $66,500.00 was treated as a management fee. The accountant retained by Neuro-Spine listed the later amount as due from TK&L, as well as Dr. Freund, to Neuro-Spine. The district court concluded that no evidence had been presented to demonstrate that Dr.

_____

[2]In a decision granting in part and denying in part summary judgment, on March 17, 2010, the district court had found that the parties had not followed the compensation scheme in Paragraph 8 of the Employment Agreement. (Dist. Ct. Op., Dist. Ct. Docket No. 73, at 11–13.) After trial, the court concluded that the parties had no agreement for repayment of excess compensation.

Freund had personally promised to pay such amount and was not indebted to Neuro-Spine for this amount.[3]

4.      Line of Credit Owed by Neuro-Spine

Neuro-Spine began operation after securing a line of credit in the amount of $600,000. Both Drs. Lorio and Freund personally guaranteed repayment. According to the district court, no evidence was presented to indicate that Dr. Freund was obligated to repay any portion to Neuro-Spine. Further, the loan has never been in default which would have triggered an obligation of a guarantor to make payment. On this issue, prior to trial, the district court granted summary judgment in favor of Dr. Freund.

**B. Dr. Freund**

In his cross appeal, Dr. Freund contends that the district court erred in failing to consider the bonus paid to Dr. Lorio on January 31, 2007. The parties understood, prior to that date, that the value of Dr. Freund's stock would be computed based upon the financial status of Neuro-Spine on January 31, 2007.

On January 29, 2007, the office manager of Neuro-Spine e-mailed the accountant, Bowles, and asked if "we were supposed to empty the NSS checking account per your suggestion." Bowles replied that he did not "want to leave anything that we don't have to in the company as of 01/31/07."

---

[3]The district court denied summary judgment sought by Dr. Freund on this issue. After trial, however, the court found from the evidence that Dr. Freund had not promised Neuro-Spine that he would be liable for the obligation of TK&L.

9

Based upon this communication, Dr. Lorio received from Neuro-Spine a gross bonus amount of $223,511.70 on January 31, 2007.

Dr. Freund contends that the payment was made in violation of the Employment Agreement. Further, Dr. Freund asserts that the amount paid to Dr. Lorio should have been included in the computation of the value of Neuro-Spine.[4] The district court concluded that, although the Employment Agreement did not obligate Dr. Freund to repay excess compensation received, the agreement did not prohibit Dr. Lorio, the majority stockholder, from causing the corporation to pay him a bonus as a method of adjustment of incomes to the two doctors. The district court noted that the agreements did not prohibit Dr. Lorio from essentially giving himself a bonus at a time he had been underpaid, vis-a-vis Dr. Freund. The district court observed:

> There is no inconsistency in the Court's findings that, on the one hand, the employment contract created no duty of an employee to repay over-paid compensation, while at the same time creating an obligation to pay to an employee at least the amount indicated by the formula. More simply, a finding that Freund is not required by the terms of the contract to repay excess compensation does not mean that Lorio was not entitled to the compensation accrued, but not paid.

The amounts paid to Dr. Lorio on January 31, 2007, were smaller than the amount of compensation overpaid to Dr. Freund, which the district court found could not be recouped upon Freund's withdrawal from the business. The district court simply found that Dr. Lorio was underpaid and Dr. Freund was overpaid. The Employment Agreement did not require after-the-fact

---

[4]In the district court, Dr. Freund raised a variety of other claims relating to the bonus paid to Dr. Lorio, including breach of fiduciary duty, together with intentional and fraudulent misrepresentation. The district court found in favor of the appellants on those claims, none of which is raised on appeal.

adjustment. Dr. Lorio controlled the corporation and paid himself a bonus. The amount of the bonus was less than the amount of over compensation received by Dr. Freund. The district court concluded that the payments made to Dr. Lorio by Neuro-Spine were therefore proper and not prohibited by the Employment Agreement.

## II. STANDARDS

As to the granting of summary judgment on one of the issues raised in this appeal, we review *de novo*. *Gecewicz v. Henry Ford Macomb Hospital Corp.*, 683 F.3d 316, 321 (6th Cir. 2012). We also apply the same standards as the district court in viewing the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Following a bench trial, this court reviews the district court's conclusions of law *de novo*. *King v. Zamiara*, 680 F.3d 686, 694 (6th Cir. 2012). We review the district court's findings of fact for clear error. *Id*.

## III. ANALYSIS

In diversity cases, "we apply state law in accordance with the controlling decisions of the state supreme court." *OneBeacon American Ins. Co. v. American Motorists Ins. Co.*, 679 F.3d 456, 460 (6th Cir. 2012) (citing *Allstate Ins. Co. v Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)). "If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data." *Id*.

## A.  Dr. Lorio

As to the appellant's claim, the district court applied familiar, basic tenets of Tennessee

contract law.  In *Rainey v. Stansell*, 836 S.W.2d 117, 118 (Tenn.  Ct. App. 1992), the court affirmed

long standing principles of contract construction:

> The cardinal rule for interpretation of contracts is to ascertain the intention of the
> parties and to give effect to that intention consistent with legal principles. . . . All
> provisions of the contract should be construed in harmony with each other, if such
> construction can be reasonably made, so as to avoid repugnancy between the several
> provisions of a single contract.

The district court reviewed the language of the Shareholders' Agreement as well as the

Physician Employment Agreement of Dr. Freund.  Prior to trial, the district court granted summary

judgment in favor of Dr. Freund to the extent that, as a matter of law, he was not personally liable

for 35% of the line of credit obtained by Neuro-Spine.  The district court correctly concluded that

no provision of either contract imposed personal liability upon Dr. Freund, entitling him to summary

judgment on this part of the appellants' claims.

Following a trial, the district court made various findings of fact and reached legal

conclusions on the issues raised in the appellants' complaint.  As described, *supra*, the court first

found that Dr. Freund was not obligated to repay Neuro-Spine or Dr. Lorio any amount in exchange

for his withdrawal from employment.  We agree that the clear terms of the Shareholders' Agreement

refer only to payment to, not from him as a withdrawing shareholder.  No contractual provision

references any obligation of a withdrawing shareholder to pay funds back upon exit.

Second, the district court interpreted the contract to find that no repayment of excess

compensation was warranted.  We agree.  The agreements make no provision for a recoupment of

compensation paid over and above the contracted formula. The parties agreed, in contradiction of the contractual terms, to use a historical formula, based upon prior earnings. The parties did not agree to recoupment, if overpayment occurred, based upon a comparison of actual income to earlier, historical assumptions. To impose such a true-up would, as the district court noted, "amount to nothing more than a rewriting of the contract by the Court."

Third, the district court also properly found that neither the Shareholders' Agreement nor the Physicians Employment Agreement imposed personal liability upon Dr. Freund for repayment of any funds paid to TK&L. Further, we agree with the district court's conclusion from the trial testimony that no oral promise was made to such effect by Dr. Freund. Regardless of any claim that the books of Neuro-Spine listed payments to TK&L as loans, the district court correctly determined that no contractual provision nor oral promise rendered Dr. Freund liable for such amounts.

The appellants make two further arguments. The first is that the district court should have applied general accounting principles to the withdrawal of Dr. Freund. Even in the absence of contractual terms, according to the appellants, the district court should have credited the testimony of Neuro-Spine's accountant who opined that general accounting principles dictated that overpaid compensation operated as a loan from Neuro-Spine to Dr. Freund. According to the appellants, the same principles required Dr. Freund be liable for a prorated share of the corporation's net debt. We disagree. To credit such testimony, as noted by the district court, would be tantamount to a rewriting of the contract, not by the parties, but by the Court.

Neither the Shareholders' Agreement nor the Physician Employment Agreement require that any overpaid amounts of compensation be repaid by Dr. Freund either before or at the time of

13

withdrawal. Paragraph 8(a) of the Shareholders' Agreement requires an exiting shareholder to repay the corporation any unpaid "indebtedness." While Dr. Freund may have been overpaid, the plain language of both agreements does not support the appellants' position that such amounts were debts under Paragraph 8(a). No note secured the amount, nor was a repayment plan contemplated. To hold otherwise would be equivalent to rewriting both agreements so as to deem overdraws as personal loans, a circumstance not agreed to by the parties.

Finally, appellants contend that Dr. Freund breached the duty of good faith and fair dealing, which under Tennessee law is implied in all contracts. We agree with the district court, which acknowledged such fact, but noted "a breach [of the duty] 'is not an independent basis for relief.'" *Duke v. Browning-Ferris Indus. of Tennessee, Inc.,* No. W2005-00146-COA-R3-CV, 2006 WL 1491547, at *9 (Tenn. Ct. App. May 31, 2006). The duty of good faith and fair dealing, in essence, limits the method of performance of a contract, rather than its expressed terms. *Sanders v. First Nat'l Bank*, 114 Bankr. 507 (M.D. Tenn. 1990), *aff'd*, 936 F.2d 273 (6th Cir. 1991). Therefore, the claims made here by the appellants implicate only the terms of the contract, rendering the duty of good faith and fair dealing inapposite.

## B. Dr. Freund

The district court found that the evidence presented failed to support Dr. Freund's counterclaim for breach of contract. On January 3, 2007, the date the value of the corporation was to be determined in the course of the buyout of Dr. Freund's stock by Dr. Lorio, a bonus of $223,511.70 was paid by Neuro-Spine to Dr. Lorio, thereby reducing the value of the stock. Dr.

Freund contends that no provision of the Shareholders' Agreement nor of the Physician Employment Agreement permitted such payment.

The district court concluded that, if the physicians had followed the compensation plan set forth in Paragraph 8 of the Employment Agreement, Dr. Freund was overpaid. Even after payment of the bonus, Dr. Lorio had not been paid what he would have been owed under the formula. From this, the district court found that the amount paid was "over-due compensation and not a bonus according to Exhibit B."

The district court also noted the following:

> There is no inconsistency in the Court's findings that, on the one hand, the employment contract created no duty of an employee to repay over-paid compensation, while at the same time creating an obligation to pay to an employee at least the amount indicated by the formula. More simply, a finding that Freund is not required by the terms of the contract to repay excess compensation does not mean that Lorio was not entitled to the compensation accrued, but not paid.

We find this portion of the decision rendered by the district court is most difficult to resolve. In regard to the appellants' claims, the district court found that the parties had agreed to use a wholly different compensation formula than that described in Paragraph 8. As to Dr. Freund's counterclaim, however, the court looked to what Dr. Lorio would have been owed under Paragraph 8. Had the district court not reached such a conclusion, Dr. Lorio would have been substantially underpaid and required to pay Dr. Freund an amount based in substantial part on the $223,511.70 otherwise left in the corporate account had Lorio not withdrawn the amount as a bonus. We agree with the district court and conclude that the fact Dr. Freund was not required to repay his over-compensation does

not compel a finding that Dr.Lorio could not pay himself amounts reimbursing in part his under-

compensation.

## IV.  CONCLUSION

Based upon the foregoing, we **AFFIRM** the district court.